DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Rondle Carroll, appeals the judgment of the Lucas County Court of Common Pleas. On May 23, 2005, appellant was indicted by a grand jury of four counts of unlawful sexual conduct with a minor, violations of R.C. 2907.04(A) and (B)(3) and felonies of the third degree, and three counts of rape committed against a person under 13 years of age, violations of R.C. 2907.02(A)(1)(b) and felonies of the first *Page 2 
degree. He entered a plea of not guilty and requested a jury trial. He was thereafter convicted of all counts and sentenced to 23 years incarceration.
 {¶ 2} Appellant's trial counsel made numerous pre-trial motions; most relevant for this appeal was a motion to compel the discovery of all law enforcement officers' investigatory notes and police reports. The trial court denied the motion and indicated that appellant's counsel should, instead, raise the motion during trial pursuant to Crim.R. 16.
 {¶ 3} Aaron, the complaining witness, testified that he met appellant when he was age ten and living with his father and older brother, Dennis. Dennis and his friend, Brian, took Aaron with them to appellant's house on Halloween. The older boys knew appellant, who lived in the neighborhood, because he would pay them to mow his lawn. Appellant showed Aaron around the house. When he showed Aaron his bathroom with a hot tub, he invited Aaron to take a bath. Aaron testified that he did so and appellant remained fully clothed but stayed and watched him. At the time, Aaron found nothing unusual about this.
 {¶ 4} Over the next few months, Aaron occasionally went to appellant's house with his brother or friends, and "hung out." The third or fourth time, he went to appellant's house alone, and appellant asked him if he would like to watch a pornographic movie. Aaron agreed. During the movie, appellant encouraged Aaron to masturbate; Aaron and appellant both did so, but Aaron testified that neither touched each other. Aaron explained that he was afraid of being perceived as homosexual if he told anyone. *Page 3 
 {¶ 5} Aaron kept returning to appellant's house, because, he explained, appellant was lenient, allowed him to smoke cigarettes, frequently took him out to dinner, and sometimes "go-carting." Aaron's father would not do these things. Aaron testified to a pattern being established: he and appellant would begin to watch a pornographic movie; after a few incidents of masturbation, their acts progressed to mutual masturbation; after several of these encounters, their acts progressed to oral sex. Sexual incidents occurred "maybe every five times" Aaron would visit appellant's house, with the visits as frequent as three times per week. Sometimes Aaron would skip school on appellant's day off from work and spend the day at appellant's house.
 {¶ 6} Aaron testified that, after many incidents of oral sex, appellant asked Aaron to perform anal sex on him. Appellant did not have anal sex with Aaron. Aaron testified that appellant could not get an erection although he could ejaculate. Appellant never explained why he could not, but Aaron guessed it was because he was diabetic. Aaron said the pattern of spending time with appellant with sexual activity occurring "a lot of the time" continued for two years.
 {¶ 7} Although Aaron testified appellant never threatened him to keep their activity secret, Aaron did not tell anyone because, he explained, "I liked him." Aaron said that sometimes he did not feel like engaging in sexual activity, and told appellant so; appellant always complied and did not pressure him to "do things." Aaron estimated that, during those two years, he and appellant engaged in either oral or anal sex approximately *Page 4 
800 times. During this time, no one questioned Aaron about his relationship with appellant.
 {¶ 8} After two years, Aaron moved from his father's house to his grandmother and step-grandfather's house. The move was precipitated in part because Aaron's father had called the police when Aaron stayed out all night; he had stayed overnight at appellant's house; his father thought that he had been gone for two or three nights and was worried.
 {¶ 9} Aaron did not call appellant to tell him that he had moved. Instead, he testified that appellant called and "made contact" with his grandmother. Aaron told his grandmother that appellant was someone who used to "take care" of him when he lived with his father. Appellant then began driving to Aaron's new home; they saw each other approximately once every one to two weeks. They would engage in mutual masturbation or oral sex in appellant's car while parked in a park or secluded area. Appellant continued to buy Aaron gifts, including a bike, jewelry, a guitar, a remote controlled car, and a television.
 {¶ 10} Sometimes, appellant would spend the night at appellant's house with appellant's great-nephew, Kenny, who was also 13 years old. Appellant also joined a conservation club to which Aaron's grandparents belonged and began camping there. Aaron would spend nights in appellant's sport utility vehicle or camper while there with his grandparents and sometimes sex acts would occur there. Aaron said they continued to engage in oral sex and mutual masturbation about twice a month, until Aaron was 15 *Page 5 
years old and in high school. At one point, Aaron asked his grandparents if he could live with appellant, but both his grandparents and appellant told him no. Aaron admitted that he had threatened to commit suicide if he could not move in with appellant; his grandmother later testified that Aaron had also made the threat to his counselor.
 {¶ 11} Aaron described two more incidents in detail. In the first incident, Aaron testified that appellant drove Aaron to a park, they got out of the car, got into the back seat, and started to masturbate. They had camera equipment in the car; Aaron said they had planned to make a pornographic movie. A park ranger noticed the car was parked illegally, and drove over. Appellant and Aaron exited the car; when the ranger asked what they were doing, they explained they were going to videotape birds. The ranger asked Aaron if he was related to appellant and where he lived. Aaron told the ranger they were friends and that he lived with his grandparents. The ranger asked if they knew where he was and requested their phone number. Aaron gave it to him, and the ranger called and left an answering machine message. Aaron later told his grandmother that he and appellant had stopped to watch people ride ATVs (presumably, all-terrain vehicles).
 {¶ 12} The second incident occurred at appellant's house. Aaron testified that he and a boy his age named "Ricky" pulled some trees out of appellant's yard as a favor. Afterwards, Aaron took a shower. Then, Ricky took a shower. While Ricky was showering, Aaron performed oral sex on appellant. This occurred in the kitchen; Ricky was showering in a bathroom close to the kitchen. When they heard the shower stop, they stopped having oral sex. Aaron initially testified that he had told Ricky about the *Page 6 
nature of his relationship with appellant; on cross-examination, he denied having told Ricky anything.
 {¶ 13} Shortly afterwards, Aaron's grandmother questioned Aaron about his relationship with appellant. Aaron explained that he did not tell her anything because he was embarrassed and did not want to get appellant into trouble. After that, he did not see appellant any longer.
 {¶ 14} Approximately two months later, Aaron was escorted home by police after he was found to possess marijuana while at school. He said he had started smoking marijuana around the time he first met appellant, at age ten; he would smoke either at appellant's house or his friend's house. Aaron's grandmother confronted Aaron, and asked him if "it was because of something that Ron did to me." Aaron then told his grandmother about his sexual relationship with appellant. His grandmother then told police. Aaron was expelled from high school.
 {¶ 15} Aaron admitted that he had several opportunities to tell police, school counselors, and teachers about his relationship with appellant; he explained that he just never felt comfortable telling anyone. He also admitted to taking marijuana over to appellant's house to smoke with Kenny, starting at age ten, but said that appellant knew that he used marijuana and would sometimes use it with him.
 {¶ 16} After Aaron's direct testimony but before the conclusion of cross-examination, appellant's defense counsel, Lorin Zaner, again raised his motion concerning disclosure of evidence by the prosecution pursuant to Crim.R. 16. Zaner was *Page 7 
concerned that the prosecution had not disclosed a police report containing the name "Ricky," whom Aaron had testified was present at appellant's house when a sex act occurred. The trial judge, Zaner, and the prosecutor agreed to research whether the police report would be admissible and to revisit the issue in the morning.
 {¶ 17} That same day, Zaner's investigator was able to locate Ricky. Based on a brief conversation between Ricky and Zaner's investigator, Zaner decided not to call Ricky at trial.
 {¶ 18} The next day, the court held an in camera inspection of the police report in which a detective took notes of his initial interview with Aaron. Zaner and the prosecution argued whether the police report contained Aaron's "statements" pursuant to Crim.R. 16(B) and whether such would be admissible. The trial judge reviewed the police report, determined that the detective's notes did not contain Aaron's "statements" and was therefore inadmissible, and that, in any event, the report was not inconsistent with Aaron's testimony. The police report was marked as a court's exhibit and preserved in the record.
 {¶ 19} The rest of the trial testimony occurred as follows. Aaron's grandmother testified that appellant had contacted her shortly after Aaron moved in with her to see how Aaron was doing. She and appellant became good friends and their families became close. They went out to dinner, went to appellant's home twice for Christmas, and she allowed Aaron's younger sisters, five year old twins at the time, to spend time with *Page 8 
appellant also. Aaron, in contrast, had said that his sisters never spent time with appellant.
 {¶ 20} She and her husband joined the conservation club to have a place to camp with their grandchildren. After appellant became a family friend, he bought a camper and joined the club. She did not see anything wrong with Aaron staying overnight with appellant at the campground; other boys did also. She noted an incident where a girl from the campground asked if she could stay the night with appellant also, and appellant said no, explaining that he did not think it would "look right."
 {¶ 21} After Aaron came to live with her, she observed his behavior and moods change, but she attributed the change to moving away from his father. She acknowledged that Aaron had asked to live with appellant several times, and she also acknowledged that the first time she confronted Aaron about his relationship with appellant, Aaron said that everything was fine. When Aaron was brought home from school by police for marijuana possession, she asked him directly if his behavior was because of his relationship with appellant.
 {¶ 22} As for Aaron's expulsion from school, she acknowledged that after Aaron disclosed a sexual relationship with appellant, a hearing was held on his expulsion. She also admitted that part of the reason Aaron was re-admitted to school was due to the allegations of sexual abuse. She also admitted that, at the time, she did not think it was odd or out of the ordinary for appellant to give Aaron expensive gifts because she and her husband were retired and appellant had greater resources. She never had any indications *Page 9 
that something was wrong about Aaron and appellant's relationship and had no reason to be suspicious.
 {¶ 23} Robert Stoltz, the park ranger who stopped appellant and Aaron in appellant's car, also testified. He testified to nearly the same sequence of events as Aaron, with two exceptions. Although Aaron had testified that he and appellant were in the back seat of appellant's car when the ranger confronted them, the ranger testified that appellant and Aaron were in the front seats of the car with camera equipment on the seat between them. He also remembered talking to someone when he called Aaron's grandmother's home, contrary to Aaron and his grandmother's testimony; they had testified the ranger left an answering machine message. The state submitted the ranger's documentation of the stop.
 {¶ 24} David Bright, a Toledo Police officer, testified that, in the course of a separate investigation, he went to appellant's house and asked appellant if he had any pornographic videotapes. Appellant voluntarily, and without warrant, escorted the officer into his home and showed him where he kept an unspecified number of pornographic videotapes.
 {¶ 25} The prosecution then rested. Appellant's counsel motioned for an acquittal, pursuant to Crim.R. 29, which the trial court denied.
 {¶ 26} Appellant called James Piotrowski and Chris Blosser, local police officers, who twice had occasion to question Aaron when he was "in trouble" for an unrelated matter. They both testified that Aaron never disclosed any allegations of sexual abuse or *Page 10 
a sexual relationship with appellant. Dean Dreher, Aaron's probation officer, also testified that Aaron never made any disclosures regarding appellant.
 {¶ 27} Ruth, whose son, Brian, was Aaron's friend and who first took him to appellant's house, testified on appellant's behalf. Dennis, Aaron's older brother, and Brian were friends and would go to Brian and Ruth's house after school. After the boys began to spend time at appellant's house, Ruth would check on them. She would visit appellant's house approximately three times per week, and only ever observed the boys playing cards or watching television. After she became more familiar with Aaron, she once asked him whether "anything ever happened between him and [appellant]." Aaron denied that anything improper or inappropriate ever happened. She also testified that her family and appellant's family would have cookouts and spend holidays together, and that appellant always gave gifts to people in her family. She explained that it was natural for Aaron to want to spend time at appellant's house when his father's apartment was "filthy" and a "mess" and Aaron had little parental supervision.
 {¶ 28} Kenny, appellant's great nephew, testified on appellant's behalf. He and Aaron became good friends during the relevant time period. Kenny testified, contrary to Aaron's testimony, that appellant never watched pornographic movies with them; instead, he said that he and Aaron found the movies on their own and watched them together when appellant was not there. He also testified that he and Aaron would supply each other with marijuana and smoke it together outside of appellant's house; he said appellant *Page 11 
never saw or knew about them smoking marijuana. Kenny testified, contrary to Aaron, that Aaron never told him about any sexual activity with appellant.
 {¶ 29} On cross-examination, the prosecution impeached Kenny's testimony with his prior testimonial statement that he had never watched any pornographic movies at appellant's house.
 {¶ 30} Appellant's former spouse also testified on his behalf. She and appellant were married for approximately 13 years and divorced in 1986. After the divorce, appellant continued to employ her in his business and they saw each other daily. They continued to be friends, taking trips together and spending holidays with family together. She testified that appellant had always been generous, giving many people jewelry. During the time periods to which Aaron testified, she asserted that she had been at appellant's house approximately once a week and had never seen Aaron there. She explained that she and appellant divorced but continued their relationship because she did not like being married, and she has remained single since.
 {¶ 31} Most relevantly, she testified that she and appellant had continued to have vaginal intercourse after their divorce, during the time of the alleged sexual relationship between Aaron and appellant, and that appellant was able to have erections. Aaron had testified that appellant was unable to have erections but that he was able to ejaculate. She did not know whether appellant took any medication related to sexual activity.
 {¶ 32} At the close of all testimony, appellant renewed his Crim.R. 29 motion, which the trial court denied. The jury found appellant guilty of each count in the *Page 12 
indictment. At sentencing, he was found to be a sexually oriented offender and sentenced to a total term of incarceration of 23 years.
 {¶ 33} Appellant raises nine assignments of error:
 {¶ 34} "1. The trial court erred to the prejudice of Mr. Carroll when it referred to him on six occasions in its Instructions to the Jury as `The Offender,' violating his right to due process and a fair trial, and his right to the presumption of innocence.
 {¶ 35} "2. The Prosecution in this matter engaged in misconduct throughout the proceedings, which combined to deprive Mr. Carroll of his right to a fair trial.
 {¶ 36} "3. The Trial Court erred and abused its discretion when it refused to grant Mr. Carroll's Motion for a New Trial due to Prosecutorial Misconduct and the discovery of new evidence.
 {¶ 37} "4. The Trial Court erred to the prejudice of Mr. Carroll when it failed to grant his pretrial motion to exclude references to the accuser as a `Victim.'
 {¶ 38} "5. Mr. Carroll was denied due process and a fair trial as guaranteed by both the United States and the Ohio Constitutions, when a witness for the State improperly engaged in witness bolstering, by vouching for the veracity of the child witness.
 {¶ 39} "6. Mr. Carroll was denied his constitutional right as guaranteed by the United States and Ohio Constitutions to effective assistance of counsel when his attorney failed to protect Mr. Carroll's rights at trial when Mr. Carroll's trial counsel failed to seek a cautionary jury instructions [sic] when appropriate, failed to timely object to leading *Page 13 
questions posed to the State's witnesses by the prosecutor, failed to object to the introduction of hearsay testimony, failed to object to bolstering testimony of the State's witnesses, and failed to object to testimony concerning improper evidence.
 {¶ 40} "7. The cumulative effect of the errors committed by the trial court, by Mr. Carroll's trial counsel and the misconduct of the prosecutor combined to deny Mr. Carroll due process and a fair trial as guaranteed by the United States and Ohio Constitutions.
 {¶ 41} "8. The Trial Court erred to the prejudice of Mr. Carroll when it failed to grant his Motion for Judgment of acquittal on all charges, as the evidence presented was not legally sufficient to support a conviction.
 {¶ 42} "9. The Convictions of Mr. Carroll in this matter are against the manifest weight of the evidence presented."
 {¶ 43} We address appellant's third assignment of error first, as it is dispositive of this appeal. In his third assignment of error, appellant challenges the denial of his motion for a new trial on the grounds that the prosecution withheld potentially exculpatory evidence, specifically, the police report referring to "Ricky," citing Brady v.Maryland (1963), 373 U.S 83.
 {¶ 44} Attached to his motion for a new trial was an affidavit from Ricky, whom Zaner again contacted after trial and further interviewed. Ricky's affidavit recounts the incident when Aaron and Ricky moved shrubs or trees at appellant's house. Aaron had testified that he performed oral sex on appellant while Ricky was in the shower. Ricky averred that, when he exited the shower, Aaron and appellant were at the kitchen table *Page 14 
playing a card game. He also listed gifts which appellant gave him, stated that appellant never did anything "inappropriate" to Aaron or himself, and that Aaron never told him of any sexual relationship with appellant. Zaner also attached his own affidavit, in which he averred that the prosecution never provided him with Ricky's name and that, after trial, he was told by the reporting detective that the police report contained Ricky's full name. He further averred that, had he had adequate opportunity to discover Ricky prior to trial, he would have called Ricky as a witness.
 {¶ 45} During the in camera examination of the police report, Zaner argued that the police report was admissible pursuant to Crim.R. 16. The prosecution argued that the police report only contained the interviewing detective's summary of his initial interview with Aaron and did not contain any "statements" which would be admissible. We find that appellant's argument has merit.
 {¶ 46} Crim.R. 16(B) requires a prosecuting attorney to disclose certain material, including witness statements, under certain circumstances:
 {¶ 47} "Upon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any of the following which are available to, or within the possession, custody, or control of the state, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney:
 {¶ 48} "(i) Relevant written or recorded statements made by the defendant or co-defendant, or copies thereof; *Page 15 
 {¶ 49} "(ii) Written summaries of any oral statement, or copies thereof, made by the defendant or co-defendant to a prosecuting attorney or any law enforcement officer;
 {¶ 50} "(iii) Recorded testimony of the defendant or co-defendant before a grand jury." Crim.R. 16(B)(1)(a).
 {¶ 51} The rule also proscribes the procedure and standards to be applied by a trial judge when confronted with a defendant's Crim.R. 16 motion requesting witness statements:
 {¶ 52} "In camera inspection of witness' statement. Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.
 {¶ 53} "If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies.
 {¶ 54} "If the court determines that inconsistencies do not exist the statement shall not be given to the defense attorney and he shall not be permitted to cross-examine or comment thereon.
 {¶ 55} "Whenever the defense attorney is not given the entire statement, it shall be preserved in the records of the court to be made available to the appellate court in the event of an appeal." Crim.R. 16(B)(1)(g). *Page 16 
 {¶ 56} In addition to reviewing the motion for a new trial, we must also address appellant's argument that his due process right to a fair trial was violated when he was refused access to the police report. When the state "fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurred whenever such evidence is withheld." Illinois v. Fisher (2004),540 U.S. 544, 547, citing Brady v. Maryland (1963), 373 U.S. 83, andUnited States v. Agurs (1976), 427 U.S. 97.
 {¶ 57} Ordinarily, appellate courts review Crim.R. 16 motions to determine whether the trial court abused its discretion. State v.Nguyen, 157 Ohio App.3d 482, 486, 2004-Ohio-2879, ¶ 15. However, whether the trial court applies an erroneous legal standard or "erred in applying the substantive law to the facts of the case," the issue is reviewed de novo. Id. at ¶ 17. Where the "materiality" of evidence is concerned, the issue is generally reviewed de novo. Id., citingState v. Hesson (1996), 110 Ohio App.3d 845, 850-852, and State v.Linscott (Aug. 22, 1995), 9th Dist. Nos. 94CA1633, 94CA1634. We also review de novo appellant's claim that the trial court applied the incorrect legal standard and a constitutional error resulted. State v.Johnston (1988), 39 Ohio St.3d 48, 60, quoting Brady v. Maryland (1963),373 U.S. 83 at 87.
 {¶ 58} In State v. Johnson (1978), 62 Ohio App.2d 31, we squarely held that, within the meaning of Crim.R. 16, a "statement" "includes a written statement signed or otherwise adopted or approved by the witness; a recording of the witness' words or a transcription thereof; and a substantially verbatim recital of the witness' statement written *Page 17 
in a continuous narrative form." Id. at paragraph one of the syllabus. Further, we adopted the following test:
 {¶ 59} "The true test is whether the statement is the witness' own, rather than the product of the investigator's selections, interpretations and interpolations. It must be shown, unless there is direct evidence the witness prepared, signed or adopted the statement, that it minimally is a continuous, narrative statement made by the witness and recorded verbatim, or nearly so." Id. at 37.
 {¶ 60} The trial judge, referring to the rule of Johnson at the in camera examination, ruled that the report was inadmissible because it did not contain Aaron's "statements," and, moreover, did not contradict his testimony. During direct examination, Aaron answered in the negative when asked whether he gave a written statement or whether he reviewed and signed the interviewing detective's notes.
 {¶ 61} The relevant portions of the report read as follows:
 {¶ 62} "[Aaron] said he got to know Carroll because his brother's friend used to cut Carroll's grass. He said that he was 10 years old at the time and that his brother was going to a Halloween party and he couldn't go. He said that he went to Carroll's house instead. He said that Carroll was in the hot tub when he got there and asked him to get in. He said that after getting out of the hot tub they watched porn movies together and that Carroll started playing with himself. [Aaron] said that Carroll asked him if he wanted to join in and [Aaron] said that he responded, `I don't care'. [Aaron] said that Carroll had him take his clothes off and that Carroll then touched his penis. He said that Carroll *Page 18 
masturbated him but he did not ejaculate. He said that the next time he was with Carroll was about a month later and that Carroll performed oral sex on him.
 {¶ 63} "* * * [Aaron] said that the last time he was with Carroll was during spring break this year, either on the Tuesday or Wednesday. He said that he went to Carroll's house and that a young boy named Ricky was there taking a shower. He said that Carroll came up to him in the kitchen and started to masturbate him. He said that he then went down and performed oral sex on Carroll. He said that he had to stop before Carroll ejaculated because the shower stopped. [Aaron] said that during the time with Carroll he was provided with alcohol, wine, cigarettes, and Carroll got him started on marijuana. * * *."
 {¶ 64} This portion of the report is identical in form to the portions of the report we found admissible in Johnson. During the in camera hearing, the trial judge remarked that the report was more like a "bulleted" summary than a narrative. However, the report inJohnson also consisted of statements which could be characterized as "bulleted": "Mike Hill advised * * *. Mike stated * * * . Mike stated * * *. Mike advised * * *" and so on. We found the report to be a "substantially verbatim recital of the witness' statement written in the narrative form." Johnson, 62 Ohio App.2d at 37.[1] Id. The form of the report in Johnson found to contain "statements" and the report at hand are identical, whether characterized as "bulleted" or not. We must, therefore, find that the *Page 19 
police report contains Aaron's "statements" within the meaning of Crim.R. 16. The trial court should have proceeded to determine whether inconsistencies existed between Aaron's trial testimony and the prior statements of the police report.
 {¶ 65} The police report at hand contains statements inconsistent with Aaron's trial testimony in three respects. First, Aaron testified at trial that when he met appellant at Halloween, Aaron got into the hot tub by himself, appellant remained clothed, and no physical contact occurred. Second, Aaron testified that it was not until the third or fourth time that he visited appellant's house that appellant invited him to watch a pornographic movie and they each engaged in masturbation. Third, Aaron testified that he would smoke marijuana at appellant's house, sometimes with appellant, sometimes with Kenny, and that Aaron sometimes brought the marijuana to appellant's house. Aaron never testified, however, that appellant "got him started" smoking marijuana, even though he had ample opportunity during questioning. During redirect examination, when asked where the marijuana came from, he answered that it came from other people.
 {¶ 66} The police report's statements are also consistent in several respects. However, because Aaron's statements in the police report are inconsistent with his trial testimony, appellant's counsel should have been allowed to use it in cross-examination. Crim.R. 16(B)(1)(g);State v. Jenkins (1984), 15 Ohio St.3d 164, 225.
 {¶ 67} Trial courts are granted discretion by Crim.R. 16(E) in fashioning a remedy. State v. Wiles (1991), 59 Ohio St.3d 71, 79. Nevertheless, the issue presented under this assignment of error is whether a new trial should have been granted based on *Page 20 
the failure of the prosecution to disclose the police report and the trial court's refusal to allow appellant's counsel access to it. Thus, our focus is on whether the inconsistent portions of the police report were "material" to the defense. Crim.R. 16(B) provides:
 {¶ 68} "Disclosure of evidence favorable to defendant. Upon motion of the defendant before trial the court shall order the prosecuting attorney to disclose to counsel for the defendant all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or punishment. * * *." Crim.R. 16(B)(1)(f).
 {¶ 69} This issue dovetails with appellant's claim that nondisclosure of the report violated his due process right to a fair trial. A criminal defendant's due process rights are violated if the prosecution suppresses evidence favorable to the accused, irrespective of the prosecution's good or bad faith. State v. Johnston (1988),39 Ohio St.3d 48, paragraph four of the syllabus, following Brady v. Maryland (1963),373 U.S. 83. If a Brady violation occurred, reversal would be required despite the lack of a motion for a new trial. The "newly discovered evidence" standard, the "probable acquittal" standard, and the "not merely impeaching" standard, governing motions for a new trial, do not govern a review of whether a due process violation occurred. UnitedStates v. Agurs (1976), 427 U.S. 97, 112-113; Kyles v. Whitey (1995),514 U.S. 419, 433-434; State v. Johnston (1988), 39 Ohio St.3d at 60. Thus we review the issue de novo instead of reviewing whether the trial court abused its discretion in denying the motion for a new trial.State v. Lawson (1992), 64 Ohio St.3d 336, 344 (utilizingpre-Bagley standard of *Page 21 Agurs). We next determine whether the police report — which was requested and withheld — is evidence favorable to appellant.
 {¶ 70} "In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome. This standard of materiality applies regardless of whether the evidence is specifically, generally or not at all requested by the defense." State v. Johnston,39 Ohio St.3d 48, paragraph five of the syllabus, following United States v.Bagley (1985), 473 U.S. 667. Reversal of the conviction is required only if it deprives the defendant of a fair trial, that is, if the "evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." Bagley, 473 U.S. at 678. "For unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose * * *." Id., 675-676, quoting United States v. Agurs, 427 U.S. at 108. Finally, the undisclosed evidence's impact on the trial must not be considered in isolation. The "cumulative effect" of both the inconsistent statements and the existence of Ricky must be considered. Kyles v. Whitley (1995),514 U.S. 419, 436-437.
 {¶ 71} Clearly, the police report was "favorable to the defendant" because appellant's counsel could have used the prior statements to impeach the complaining *Page 22 
witness. Impeaching the state's only witness to the alleged criminal acts would probably have resulted in a different trial. Aaron's testimony was the only direct evidence bearing on appellant's guilt.
 {¶ 72} "Impeachment evidence, however, as well as exculpatory evidence, falls within the Brady rule." Bagley, 473 U.S. at 676, citingGiglio v. United States (1972), 405 U.S. 150, 154. "[T]he principle that a State may not knowingly use false testimony to obtain a conviction — even false testimony that goes only to the credibility of the witness — is `implicit in any concept of ordered liberty'." Id. at 680, quotingNapue v. Illinois (1959), 360 U.S. 264, 269. Where the undisclosed evidence would have resulted in the impeachment of the prosecution's main witness, undermining his credibility, the evidence is by and large material. United States v. Shaffer (C.A. 9, 1986), 789 F.2d 682,688-689. Impeachment evidence is "favorable to an accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence * * *." Bagley, 473 U.S. at 676, citing Brady, 373 U.S. at 87, and Napue v. Illinois (1959), 360 U.S. 264, 269 (internal quotations omitted).
 {¶ 73} In point of fact, the prosecution repeatedly asserted in closing that the entire case rested on Aaron's credibility. Also, the prosecution used Aaron's trial testimony that first appellant saw him naked in the hot tub, progressed to individual simultaneous masturbation, then progressed to further acts, to bolster its theory that appellant slowly "groomed" Aaron to engage in sexual activity. Undisclosed evidence is also "material" if *Page 23 
it undermines the prosecution's theory of the case. State v.Johnston, 39 Ohio St.3d at 62. Assuming that Aaron would have been impeached with his prior inconsistent statement that the first time Aaron met appellant they watched pornography and masturbated each other, the prosecution's theory is weakened, and confidence in the outcome of the trial is undermined.
 {¶ 74} Additionally, the police report reveals the existence of "Ricky." Ricky's testimony would be essentially duplicative of Kenny's testimony: While Aaron testified that he did tell Kenny, appellant's great-nephew, of the sexual relationship, he later reversed that position, and Kenny testified that Aaron never told him. Ricky also averred that Aaron never told him about sexual acts with appellant. Kenny asserted that he and Aaron provided marijuana for each other and appellant never used it with them. In his affidavit, Ricky averred essentially the same. However, Kenny was impeached with his prior testimony regarding the existence of pornographic videos and thus his credibility was called into serious question. Ricky's testimony, therefore, would not be superfluous; it would have aided the defense by bolstering, if not replacing, Kenny's testimony.
 {¶ 75} "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal * * *." Kyles v.Whitley (1995), 514 U.S. 419, 434. "Bagley's touchstone of materiality is a `reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he *Page 24 
received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. Further, once there has been aBagley error, it can be concluded that the defendant was not given a fair trial and reversal is required. "[O]nce there has beenBagley error as claimed in this case, it cannot subsequently be found harmless * * *." Id. at 436.
 {¶ 76} A reviewing court must also consider the cumulative effect the undisclosed evidence would have had on the trial in its totality.Bagley, 473 U.S. at 683. The undisclosed police report would have had a considerable cumulative effect, sufficient to undermine confidence in the outcome. The prosecution's theory that appellant "groomed" Aaron by slowly engaging him in sexual activity becomes less than plausible. The prosecution's complaining witness would have been impeached with his prior version of his initial meeting with appellant and his credibility called into question. "Whenever the Government fails, in response to a request, to disclose impeachment evidence relating to the credibility of its key witnesses, the truth-finding process of trial is necessarily thrown askew." Id. at 690. Also, the defense would have had another witness close to both Aaron and appellant when an alleged sex act occurred and who would have testified that Aaron never told him of a sexual relationship with appellant. Ricky's testimony would have raised questions regarding the complaining witness' version of how and when one alleged sexual act occurred and would therefore have raised additional questions regarding the complaining witness' credibility.
 {¶ 77} In sum, the prosecution failed in its duty to disclose evidence pursuant to Brady v. Maryland, and the trial court erred in denying appellant's Crim.R. 16 motion. *Page 25 
Appellant did not receive a fair trial as guaranteed by the Due Process Clause of the Fourteenth Amendment, United States Constitution. The third assignment of error is well-taken. Due to this disposition, the remaining assignments of error are rendered moot.
 {¶ 78} The judgment of the Lucas County Court of Common Pleas is reversed and this matter remanded for further proceedings consistent with this decision. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT REVERSED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Arlene Singer, J., William J. Skow, J. CONCUR.
Peter M. Handwork, J., DISSENTS AND WRITES SEPARATELY.
[1] Johnson did not reverse the trial court's judgment, despite the lack of an in camera hearing, because the statements were not inconsistent with the witness' trial testimony. *Page 26