[Cite as *State v. Thompson*, 2022-Ohio-2438.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-21-1015

      Appellee                              Trial Court No.  CR0200703684

v.

Stoney Thompson                            **DECISION AND JUDGMENT**

      Appellant                             Decided:  July 15, 2022

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

David Klucas, Michael H. Stahl, Claire R. Cahoon, and
Stephen C. Newman, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Stoney Thompson, was

convicted of the October 24, 2006 murders of Todd Archambeau, Kenneth Nicholson,

and Michael York.  Thompson now appeals the January 6, 2021 judgment of the Lucas

County Court of Common Pleas, denying his motion for a new trial.  For the reasons explained more fully below, we reverse the trial court judgment.

{¶ 2} Briefly summarized, a change in Ohio case law announced in 2016, permitted Thompson to obtain the state's investigative file via a public records request. A review of that file revealed that the state failed to disclose to Thompson—either during pretrial discovery or at trial—several items of evidence, including a photo of a full-size bloody shoeprint, recorded interviews of two witnesses, and information about alternative suspects.

{¶ 3} *Brady v. Maryland*, 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194 (1963), obligates the state to turn over evidence that is favorable to the defendant and material to guilt or punishment.  A *Brady* violation occurs when (1) the state suppresses evidence, either willfully or inadvertently; (2) the evidence is favorable to the defendant as either exculpatory or impeachment evidence; and (3) prejudice has resulted to the defendant. Prejudice occurs when there is a reasonable probability that the result of the trial would have been different had the evidence been disclosed to the defense, thereby undermining confidence in the verdict.

{¶ 4} It is undisputed that the evidence at issue here was not disclosed to Thompson.  The recorded interviews and information about alternative suspects was favorable to Thompson because it had significant exculpatory or impeachment value. And when considered cumulatively, the failure to disclose this evidence to Thompson prejudiced his defense and undermined confidence in the verdict.  Because there was a

2.

reasonable probability of a different outcome had the additional evidence been disclosed to Thompson, we find that the trial court erred in denying his motion for new trial. We reverse and remand for a new trial.

## I. Factual Background

{¶ 5} On October 24, 2006, at 4:37 a.m., Toledo police officers were dispatched to 410 Ohio Street, Toledo, Ohio, after a 9-1-1 caller reported hearing gunshots. Police arrived at the boarded-up house and discovered the bodies of Todd Archambeau, Michael York, and Kenneth Nicholson. All three men had sustained gunshot wounds and sharp force injuries; Archambeau also sustained blunt force injuries to his head.

{¶ 6} Brothers Stoney Thompson ("Thompson") and Goldy Thompson ("Goldy") were charged with murdering the three men. On June 10, 2008, following a six-day trial and 15 hours of deliberation, a jury convicted Thompson of three counts of complicity in the commission of aggravated murder, violations of R.C. 2923.03(A)(2) and 2903.01(A) and (F). The jury acquitted Thompson of accompanying firearms specifications. Thompson was sentenced on June 27, 2008, to three terms of life in prison without parole, to be served consecutively.

{¶ 7} In a separate trial beginning ten days after Thompson's sentencing, a jury acquitted Goldy.

## A. The Trial

{¶ 8} The following evidence was introduced at Thompson's trial, summarized in the order it was presented.

3.

### 1. Sergeant Thomas Kosmyna

{¶ 9} On October 24, 2006, at approximately 4:40 a.m., Thomas Kosmyna, a Toledo Police Department Shift Sergeant, responded to a call of shots fired at 410 Ohio Street. The house was boarded up and only the back door allowed access to the house. Kosmyna and Officers Britt and Mohler entered the house, which led into the kitchen. A light was on in the first-floor bedroom; there was no light on in the kitchen. They immediately saw a victim slumped over against a door in the kitchen. Britt stayed with the victim. Four more officers arrived in pairs.

{¶ 10} Kosmyna saw fresh blood on a large cardboard box in the dining room. After clearing a first-floor bedroom, he followed a trail of blood up the stairs. There was blood on the walls. The blood trail led to a front upper bedroom where Kosmyna observed a pool of blood on a window sill. There was chicken wire over the window, and blood ran down the roofing and onto the driveway. He believes that the window was open.

{¶ 11} Kosmyna went to the back bedroom where a second victim was lying on his back with steam emanating from his body and blood oozing from his wounds. A third victim was on the floor next to him. There was blood all over the room, including on the floor. Kosmyna saw three bloody footprints in the carpet at the head of the second victim. He maintains that those footprints were already there when he arrived. They had a boot-lug pattern and the toe of the boot print pointed in the direction of the second victim.

4.

{¶ 12} Kosmyna allowed two firemen to enter the house to ensure that there were no signs of life. He ordered the other officers out of the house and walked the firemen through so no evidence would be disturbed. He secured the scene until detectives arrived.

{¶ 13} Kosmyna acknowledged that he had worn boots that night and got blood on his sleeve and on his boots. He denied touching the bodies. He did not know if the firefighters got blood on them. Kosmyna maintained that you could step around the blood if you looked for it. He did not recall seeing or walking on any visqueen on the floor. Kosmyna does not believe that officers' boots were taken for footprint analysis.

{¶ 14} Detective Bill Goetz was next to arrive at the scene. At that point, Kosmyna searched the area behind the house, down the alley, and through the yard and open field. He saw a footprint in the alley in dust and marked it.

### 2. Officer Shawn Mohler

{¶ 15} Shawn Mohler is a Toledo Police officer who was dispatched to 410 Ohio Street. He responded, along with Kosmyna and Britt. The house was boarded up, but he could see a light on through a gap between one of the boards and the window. The front door was boarded shut, but the back door was not. He pushed the door at the top and it swung open. He was the first to enter the house. At the back of the house, it was dark, so he used a flashlight; he did not flip the light switch or touch any door knobs. The officers saw the first victim leaned up against the wall in the kitchen, blocking the door to the basement. Mohler shouted, "show me your hands!" When there was no movement,

5.

Mohler realized it was a homicide victim.  At this point, they were still outside the house looking in.  He called for back-up.  Four other officers reported to the scene.

{¶ 16} Britt took position at the back door.  There was blood everywhere.  Mohler proceeded cautiously, not wanting to disturb the scene, but wanting to check for other victims or suspects.  He saw a trail of blood on a piece of cardboard that was leaning up against the doorway, draped toward the entrance to the first-floor bedroom.  There was a light on in the bedroom—either a lamp or a ceiling light.  It was not well lit.  The officers followed the blood trail up the steps.  Mohler followed behind Kosmyna.  There was blood on the walls, carpet, steps, and hallway.  He did not want to step in blood or make a blood trail.

{¶ 17} On the second floor, the front bedroom was empty, but there was blood.  Kosmyna announced that there were two more victims in the rear bedroom.  One of the victim's heads had been almost completely cut off.  There was blood everywhere and a circular pattern of footprints on the sides of the bodies that had not been made by the officers.  The house was cool and there was steam coming from one of the victim's open wounds.  It appeared to Mohler that one of the victims tried to get away through the window in the front bedroom because there was blood sprayed onto the roof and down the eaves troughs.  There was chicken wire screwed onto the window preventing anyone from getting out.

{¶ 18} After clearing the house, Mohler exited so as not to disturb the scene.  The fire crew was called to pronounce the victims dead.  Britt kept a crime scene log.  She

6.

never entered the house. Mohler said that he did not get blood on himself—he did not want to track any blood home. He said that they were trained and would not have stepped in the blood, however, it was hard to avoid it on the steps. The footprints he saw could have been made by boots; he was wearing New Balance tennis shoes. Mohler did not know what brand of shoes the other officers were wearing.

{¶ 19} Mohler did not recall seeing any visqueen.

### 3. Detective Scott Smith

{¶ 20} Scott Smith is a Toledo Police detective. He assisted Detective Bill Goetz in investigating the murders at 410 Ohio Street. He arrived around 7:30 a.m.; Goetz was already there, as were several uniformed officers, the command officer, and the coroner investigator.

{¶ 21} Smith shot video footage of the scene that was marked as an exhibit. In creating the video, he tried not to disturb the scene. There was very little light—the house was boarded up and only one light was on. Only he and Goetz were inside at the time. At trial, Smith narrated the images depicted on the video; the video contained no audio.

{¶ 22} Kenneth Nicholson was the first victim encountered. There were shell casings and shoeprints in the kitchen and a lot of blood in the archway. There was a large amount of blood on a piece of cardboard and on a piece of visqueen found on the dining room floor. The television was on in the bedroom, which means there was electricity to the house.

7.

**{¶ 23}** Blood on the stairs and walls evidenced that an injured person went up the stairs. Blood was smeared on the wall and a trail to the upstairs room suggests that a victim went to the window—there was blood on the window sill, the screen was pushed out, and there was a blood trail down the shingles to the eaves trough and onto the driveway.

**{¶ 24}** The second victim, Michael York, was on his back. There were shoeprints around him and a ball cap next to him. The third victim, Todd Archambeau was on his stomach.

**{¶ 25}** Four .25 caliber shell casings were found in the kitchen and a bullet hole in the kitchen wall from which a projectile was retrieved. There were cigarette butts on top of blood. On the second floor there was a shell casing in the corner of the bedroom where the victims were found.

**{¶ 26}** Plaster casts were made of shoeprints found in the alley. Goetz dusted for fingerprints, but the amount of blood made it difficult to get useful prints. Archambeau's prints were identified.

### 4. Detective Terry Cousino

**{¶ 27}** Toledo Police Detective Terry Cousino arrived at the scene around 8:15 a.m. He is an expert in blood stain pattern interpretation. He took photos of the blood stain patterns at 410 Ohio Street. He described his observations of the crime scene.

**{¶ 28}** Nicholson sustained two gunshot wounds—one to the head and one to the chest. Sixteen inches above his body there appeared high velocity blood stain patterns.

8.

He sustained a cut to the left side of his neck from his cheek to the back of his neck that was probably inflicted postmortem—it was not deep and did not bleed.

{¶ 29} On a piece of visqueen found on the floor, there were passive drips of blood and several partial bloody shoeprints. A cigarette was dropped on the floor after the blood was deposited. On the cardboard and at the bottom of the stairway Cousino observed what appeared to be arterial spurts of blood. There was expired blood very low to the steps, approximately 24 inches from the floor. It was impossible to walk up the stairs without stepping in blood.

{¶ 30} It appeared Archambeau tried to get out the window. Dripping blood led to where his body was found. There was coagulated blood under him, likely originating from his nose, where he had been shot. There was additional blood from superficial injuries and what appeared to be a postmortem cut to his neck that was not very deep. There was a bloody boot print on the carpet near his head. Blood on his Asics tennis shoes demonstrates that Archambeau treaded through blood.

{¶ 31} York's legs were on top of Archambeau's. A smear of striated mud suggests that someone stepped across his face. There were bloody boot prints to the right of York's body—a lug pattern consistent with work boots. There was no blood on York's pants or Nike shoes, but there was mud similar to the color of the mud on his face. Cousino believed that York was upstairs before Archambeau.

{¶ 32} Outside, there were three distinct single-file shoeprints in the mud heading to 410 Ohio Street from the corner of the alley. One of the herringbone shoeprints is

9.

consistent with the characteristics of York's shoe; one was an athletic shoe; one was a work boot with little star patterns similar to the bloody prints found in the house. There were four feet between the toe of the first shoe and the heel of the last shoe. Cousino could not say how long the footprints had been there in the mud, but he guessed that they were not old based on the condition of them.

{¶ 33} Partial shoeprints found on the visqueen had a herringbone pattern and lettering. There was a partial print consistent with Archambeau's Asics shoe. On one of the other prints, the word "propulsion" can be seen, along with the letter "e" around the instep of the shoeprint. There are circular patterns in the toe section and inside the ball of the foot. Cousino went to Dick's Sporting Goods and found that Nike Air Up Tempos say "engineered for propulsion" on the bottom of the shoe and have patterns consistent with the imprints made in the visqueen and mud. He talked to a Dick's employee who said that the Nike Air Up Tempo was a model sold exclusively at Dick's. It came in several colors. It was just a lucky coincidence that Cousino found the shoes there. He also went online and found photos of the shoe; there was no mention that the shoe was a Dick's exclusive.

{¶ 34} Cousino's theory is that York came to 410 Ohio Street with the two people who left the boot print and the Nike Up Tempo print. The three people were traveling in a line. He believes Nicholson was shot, then York ran upstairs. Archambeau was then shot in the nose, began bleeding, leaving a trail of blood. He died first in the rear bedroom, lying along the side of the north wall. York was shot in the head, then

10.

sustained extensive injuries to his neck. York was initially in a prone position, then flipped over on his back; someone then stepped on his face.

{¶ 35} Cousino looked in the windows at 407 Columbus Street—Thompson's apartment, also referred to as the "G unit." The side of the house faced the alley and back of 410 Ohio Street. On October 31, 2006, police searched a blue sedan that had been parked at the G unit. They found a Slim Jim wrapper and a Budweiser bottle cap. They were not submitted for testing. There were no useable prints from the car. Nicholson had a Slim Jim wrapper in his pocket and there were a lot of Budweiser bottles in the kitchen at 410 Ohio Street.

{¶ 36} The victims' fingernails were not analyzed. Cousino did not know if any hair and fibers were identified and did not know if duct tape found at the scene was analyzed. There was no indication that duct tape was used in the crime, but there was a piece of duct tape in the room where York and Archambeau were found. Cousino agreed that there could be genetic material on the duct tape. Cousino was not sure if the striations on York's face were made by a shoe or a boot.

{¶ 37} Five shell casings were found in the house.

### 5. Cynthia Beisser, M.D.

{¶ 38} Cynthia Beisser, M.D. is a Lucas County Deputy Coroner. She performed York's autopsy. York sustained a gunshot wound that went from his right temple into his nose. It was not a fatal injury. He sustained sharp force injury to the right side of his neck and chin that was inflicted with a sharp blade and went almost all the way around

11.

his neck. This is what caused his death. He was still alive at the time he sustained the gunshot wound. There were no defensive wounds. His fingernails were very short and she did not do scrapings—there was no place for hair or fiber. He had cocaine in his system and a BAC of .08. Dr. Beisser did not examine York's clothing; she turned it over to police.

### 6. David Cogan

{¶ 39} David Cogan works in the Toledo Police crime lab. He confirmed that the same gun was used to shoot both Nicholson and York. Twenty-five caliber bullets removed from Archambeau's head and from Nicholson's head were determined to have been fired from the same gun. The other fired rounds that were found in the victims' bodies cannot be excluded as coming from the same gun. All were .25 caliber bullets. As to the casings found, all were Winchester brand and all had been chambered in the same gun.

### 7. Roger Barnett

{¶ 40} Roger Barnett has known Thompson ten to 15 years and has worked for him on and off. Thompson has a red Ford truck. He met York working on Thompson's house on Maplewood. York was also working for Thompson. Barnett knows Goldy through their brother, Ricky. He is closer with Thompson than Goldy. He knew Archambeau and his brother through the neighborhood. Nicholson and Archambeau stayed at the same house on Ohio Street. Nicholson is Archambeau's brother-in-law.

12.

Barnett never saw any confrontation between Thompson and Archambeau, Nicholson, or York.

{¶ 41} Barnett never saw a weapon on Thompson's person, but he saw a pistol in the panel of the door of Thompson's truck—it was either a .22 or .25 caliber—in August or September of 2006. He acknowledged that "everyone" drove Thompson's truck and it could have belonged to another driver, but he took for granted that it belonged to Thompson. Barnett has a criminal record and is not supposed to be around guns, so he told Thompson "you can't leave stuff in there like that when I'm driving." He does not recall Thompson's reaction or whether Thompson denied that the gun was his.

### 8. Daniel Ruffing

{¶ 42} Daniel Ruffing is a friend of Thompson's. He lives approximately five minutes from the G unit. Ruffing went to the G unit on October 23, 2006, the night before the murders, around approximately 10:00 or 10:30 p.m. until approximately midnight or later. He got home around 1:00 a.m.

{¶ 43} York was also there; he and Thompson were good friends. York and Thompson were talking about a break-in that had occurred at the G unit. Somebody down the street had broken in. A TV was stolen. Thompson did not say who had broken in, but it was clear that he did not hold York responsible for it. In fact, York said he would "go down there" and take care of it. There was no talk of killing anyone, but it seemed like Thompson and York did not want Ruffing to know what they were talking about—they were speaking in low tones. Thompson seemed fine when they first started

13.

discussing it, but became more agitated. After about ten minutes, he did not want to talk about it anymore. At that point, Nicholson came over. Ruffing did not know Nicholson. He later learned that Nicholson was one of the murder victims. Nicholson stood between the door and the window. The conversation seemed tense and Ruffing became uncomfortable, so he left about five minutes later.

{¶ 44} While at Thompson's apartment, Ruffing saw a black automatic pistol on the entertainment center in Thompson's room. Ruffing could see it from the bedroom doorway where he was standing. He does not know what caliber. He did not pick up the gun because Thompson did not want him to. He said it could have been an air soft or BB gun—they look almost identical—but he questioned why Thompson would have a fake gun. It looked real and without picking it up, he would not know it was fake. He emphasized that he did not touch it or pick it up. He did not see any other weapons at Thompson's apartment except the gun. Ruffing saw no knives or sharp objects at Thompson's.

{¶ 45} Ruffing does not know what type of shoe he was wearing on October 23, 2006, but he usually wears tennis shoes—K-Swiss or Jordans. He does not have regular Nikes. Thompson mostly wore boots or Air Force Ones. Ruffing brought cans of Coors light over to Thompson's. He does not know what the others were drinking.

{¶ 46} There was a washer and dryer in the G unit. He saw nothing to indicate that Thompson was moving.

14.

{¶ 47} Ruffing saw Thompson three times after the murders.  He saw him twice at Ruffing's house.  He saw him once at a laundromat in Maumee.  Ruffing asked Thompson about what had happened to York, and Thompson said it was messed up and changed the subject.

### 9. Tivita Pierce

{¶ 48} Tivita Pierce is the mother of three of Thompson's children.  She and Thompson were no longer together in 2006, but she would see him a couple times a week.  She did not have any conversations with Thompson about the murders, but Thompson asked her to tell Detective Anderson that on the night of the murders, Kenya Sharp dropped Thompson off at her house.  Pierce refused to tell this to Detective Anderson because it was not true.  Thompson did not tell her why he wanted her to lie.

### 10. Gabriel Feltner

{¶ 49} Gabriel Feltner is a forensic scientist with the Bureau of Criminal Investigations.  According to the testing that was performed, Archambeau's DNA was identified on the cigarette found on the kitchen floor.  York's DNA was identified on a cigarette found upstairs.  Archambeau's DNA was found on one of the beer bottles.  A mix of Nicholson's DNA and an unknown contributor were found on another bottle.  Neither Thompson nor Goldy's DNA was found on any of the items that were tested.

### 11. Kenya Sharp

{¶ 50} Thompson is the father of Kenya Sharp's two children.  She lived in Regina Manor apartments, but the G unit was in her name.  It is a seven-to-eight minute

15.

drive between Regina Manor and the G unit. She stayed there sometimes. She drove a white Oldsmobile.

{¶ 51} Sharp saw Thompson at Regina Manor at around 10:00 p.m. on October 23, 2006, and earlier in the day at the G unit. When Thompson left Regina Manor, Sharp went to bed. She had no other contact with him that night. He called her the next morning between 6:15 and 6:30 a.m. and again about five minutes later. He told her he ran out of gas and asked her to bring him some. She took her kids with her in her white Oldsmobile and brought gas to him at the G unit at around 7:15 or 7:30 a.m. She and the kids went inside. Police cars were all around. She asked Thompson about it and he told her that he and York were in the apartment sleeping. York was a good friend of his and Sharp saw him often. She did not see York at the G unit that morning.

{¶ 52} About 15 or 20 minutes later, Thompson had her carry two heavy bags to her car. He said it was dirty laundry. She put the bags in the back seat. She never looked inside them. The G unit had a washer and dryer. Sharp said Thompson was planning to move out of the G unit and was in the process of doing so on October 24, 2006.

{¶ 53} Thompson left the G unit with Sharp and the kids and they went to Regina Manor. She got the kids ready for school. From an upstairs window, at around 8:00 a.m., she saw Goldy. Thompson was in the house. She heard the door open and close several times. When she went downstairs, it was just Thompson. She did not pay attention to whether the two bags were still there, but she never saw them again.

16.

{¶ 54} Thompson went with her to take their daughter to Chase School. They then went to the G unit. There was a white man with a notepad on the front step. She and Thompson drove to Regina Manor. She returned to the G unit by herself to see what was going on. The white man identified himself as Detective Danny Navarre. Navarre asked where Thompson was, and Sharp told him she did not know. She admitted that this was untrue. Navarre gave her his card and said to give it to Thompson. Sharp told Thompson a detective was looking for him.

{¶ 55} At the time she went to the G unit, Sharp did not know York had been murdered. She and Thompson saw it on the noon news. Both she and Thompson were shocked and puzzled. Thompson told Sharp he did not want to be involved because he was high at the time and they were always accusing him and his brother of stuff.

{¶ 56} Sharp saw Thompson tearing up a Nike shoe box at Regina Manor. She did not remember the brand. Thompson wears all kinds of shoes and all colors. She saw him wear black tennis shoes both before and after the murders. He also wore boots and Air Force Ones. When she talked with Detective Anderson, she identified that he wore Nike Up Tempos. At trial, she denied telling Anderson that she never saw the shoes again after the murders, but after the state refreshed Sharp's memory with prior statements, she admitted telling this to Anderson. Thompson told Sharp to tell police that she picked him up from Tivita Pierce's house. This was not true.

{¶ 57} Sharp said there had been a break-in at the G unit two-to-three weeks before the murders. She said someone busted in the window, but it was cleaned up

17.

before she got there; the window was never replaced. York, Ruffing, and Thompson were at the G unit. They were angry and wanted to know who did it. She did not remember them talking about retaliation, and she did not know what was stolen, but they wanted to get the stolen items back. After her memory was refreshed, she said an air compressor and Pierce's TV were stolen from the G unit. She also said that York, Ruffing, and Thompson said they were going to "fuck them up."

{¶ 58} Thompson moved out of the G unit and the washer was being moved to Thompson's sister's place. At that time—a week or week-and-a-half after the murders—Sharp saw a bloody sock in the washing machine. She gave it to Thompson's mom, who burned it. Thompson told Sharp that Goldy said there are no witnesses to homicides and that Thompson was going to kill her. Thompson told her that Goldy said that if she went to the G unit that morning, she would be murdered. She said one time Thompson put a knife to her neck and said "I'll do you like they did Mike" if she told about the garbage bags. These threats did not cause her to be concerned; she did not take them seriously.

{¶ 59} Sharp was charged with obstruction and receiving stolen property. She was indicted on May 3, 2007, and June 7, 2007. Sharp talked with Anderson on August 27, 2007, August 30, 2007, and September 21, 2007—all these interviews were recorded. She claimed that Anderson offered her two weeks' vacation and $5,000 per victim. They (law enforcement) also threatened to take her kids away and even pretended like they were calling children's services. On September 21, 2007, she made statements to Anderson and the charges were dismissed. She made the statements because she was

nervous. Sharp claimed that she was high when she spoke with Anderson, however, the state pointed out to her that she had given 15 negative urine samples during this general time frame.

{¶ 60} Thompson let York and others drive his red truck. On the morning of October 24, 2006, her white Oldsmobile was parked at Regina Manor.

### 12. *Lynette Avery*

{¶ 61} Lynette Avery knows Thompson. She dated Goldy in 2004 or 2005. She first learned of the murders in the paper or on the news.

{¶ 62} Avery gave a statement to Detective Anderson in October of 2007. She said that in July of 2007, she talked with Thompson about the murders as they smoked marijuana together. She described that he was stressed about everything going on. He told her "I fucked up, I'm fucked up." She asked him about the murders. He did not say that he committed the murders, but he said "whatever happens, I'm not going down by myself." Avery described that between October of 2006 and July of 2007, Thompson stayed to himself, lost weight, looked stressed, and did not look himself.

{¶ 63} Avery said that she knows Thompson and it is hard to believe that he would have committed the murders. She believed Goldy could be involved, however, and that Thompson could be influenced by Goldy. She described Goldy as bad news. He has harmed her physically in the past.

*13. John Kuch*

{¶ 64} John Kuch was in Allen County Jail for felonious assault. He was indicted on April 3, 2007; he talked to police on May 16 and 23, 2007. He agreed to testify in exchange for judicial release. This agreement reduced his prison time by eight months. Kuch denied seeing a newspaper article in March of 2007 asking for help in solving this homicide.

{¶ 65} Kuch has known Thompson for 16 years. Thompson sold drugs out of the G unit. On October 24, 2006, a neighbor came over to Kuch's house wanting to buy drugs. He gave Kuch $80. At around 3:00 or 4:00 a.m. Kuch went to the G unit to buy drugs. He parked his vehicle. As he was getting out of his car, he heard gunshots. He heard another shot as he walked to the house. Kuch beat on the door of Thompson's apartment, but no one answered. Two to three minutes later, he turned to go back toward his car and heard someone run across the yard from Ohio Street. It was Thompson and Goldy. He estimated that it was 4:00 or 4:15 a.m. Kuch asked what was up and if Thompson had any cocaine. Thompson told Kuch to get with him later. Thompson popped the trunk to a white Oldsmobile and threw a heavy-sounding brown paper bag into the trunk. Thompson seemed normal, not nervous.

{¶ 66} Goldy went to the red truck and tried to start it, but it would not start. Goldy got out and said, "white boy, come here and help me get the truck started." Kuch is a mechanic. The battery was dead and would not start. Goldy asked Kuch if he was going to the Point. There was something wet and dark on the left side of Goldy's face.

20.

Thompson told him to "get that shit" off his face. Goldy grabbed a rag out of the truck, wiped his face, and threw it out the window. Kuch dropped Goldy off at his sister's house. Goldy told him "you didn't see me tonight." Kuch estimated that he was at the G unit around ten minutes. The police took his vehicle and searched it. He does not know if any evidence was found.

{¶ 67} Kuch sold Thompson guns in the past, including .32, 9 by 17, .22, .25, and .357 automatics and pistols. He sold him a .32 a month before the murders. He did not know if Thompson carries a gun and does not know what happened to the guns after he sold them to Thompson. The sale of the .25 was nowhere near the date of the murders.

{¶ 68} Kuch denied telling police that he was driving and Goldy flagged him down. He denied being asked on May 16, 2007, why he was changing his story. He admitted that he has lied to police before. Kuch said that he was not willing to tell police anything at first because he was scared for his family. He insisted that he was in danger in prison because of testifying.

*14. James Nicholson*

{¶ 69} James Nicholson ("James") was in prison and testified as part of a plea agreement. Nicholson was James's brother and Archambeau was his brother-in-law. In 2006, James was living on North Erie with Michael Dotson and Morton Hollowell. James met Thompson once but did not know Goldy.

{¶ 70} In October of 2006, about seven to ten days before the murders, James sold Thompson a compressor and nail guns that he stole from a construction site. James's

21.

brother had put him in contact with Thompson. James took the items to the G unit. York inspected the items and Thompson agreed to purchase them. He asked James if he would accept half the money then and half later. James's brother said Thompson's word was good, so James agreed.

{¶ 71} James called Thompson the next day, and Thompson put him off. He called again, but Thompson stopped answering his calls. James went to Thompson's apartment and sat in the driveway till midnight one night and Thompson never showed. James responded by going through a boarded-up window and taking TVs, DVDs, a play station, and other items from Thompson's apartment. He took these items to his garage on North Erie Street. James talked to Thompson the next day and Thompson told James to return his stuff and he would give him the compressor back. James told Thompson he did not know what Thompson was talking about. The Saturday before the murders, James was arrested for receiving stolen property.

{¶ 72} On the morning of October 24, 2006, Detective Danny Navarre came to see James in jail and told him about the murders. James told him about the compressor and directed him to the G unit. A few days later, James learned that Dotson had the stolen items cleared from the garage. Dotson asked Nicholson and Archambeau to help him and Dotson gave them the TV from Thompson's bedroom. Navarre showed James still photos from Ohio Street and James recognized the TV in the photos as the one he stole from Thompson—a "regular," "big" TV (not a flat-screen). James did not know if Thompson knew that the TV he stole was in the Ohio Street house.

22.

### 15. *William Robasser*

{¶ 73} William Robasser was an inmate who received a plea agreement in exchange for testifying.  He approached the state with information.  The agreement reduced his prison time by three years.  Robasser agreed to cooperate because it was "the right thing to do."  He denied ever lying to police or lying under oath.

{¶ 74} Robasser testified that while housed together in the Lucas County jail—after being acquainted for only 48 hours—Thompson told him that he was nervous about the case but that he did not believe that the state had evidence to convict him.  He told Robasser that the victims had their throats slit, were shot, and were bashed in the head with a brick.  Thompson told Robasser that the murders had something to do with one of the victims' brothers, Jimmy Nicholson.  He said they were looking for Jimmy Nicholson.  Thompson did not say what role he played in the murders.  He said that his brother was also involved.

### 16. *Michael Bombrys*

{¶ 75} Michael Bombrys is a retired police sergeant employed as a supervisor for the City's department of neighborhoods.  Goldy was a seasonal employee.

{¶ 76} On October 24, 2006, Goldy was supposed to be at work at 7:30 a.m., but was ten minutes late.  He was wearing black work boots, black jeans, and a dark jacket.  At around 8:30 or 8:35, Goldy left with a crew for a job site.  After about 30 to 45 minutes, he left the job site in the city vehicle without permission and was gone for two

23.

to two-and-a-half hours. When he returned, he was wearing beige sweat pants, white Adidas tennis shoes, and a jacket. He had put 45 miles on the vehicle.

{¶ 77} When asked about his whereabouts, Goldy said that he had defecated himself and went home to shower and change. He said that while home, his girlfriend called and was worried that she had cancer. He told Bombrys he went to be with her at St. Vincent. Goldy said that he did not call work because his cell phone died and he did not have change for the payphone. Soon after telling this story, Goldy put money in a vending machine to buy pop. When confronted with the fact that he had change for the vending machine but not for the payphone, Goldy said that he forgot he had change.

{¶ 78} Bombrys did not see blood on Goldy's clothes, shoes, or hands. He was behaving unusually, however. Bombrys said Goldy was "bug-eyed." He suspected that Goldy had used the vehicle to make a drug run. He was concerned enough about Goldy's behavior that he physically distanced himself from Goldy.

### 17. *James Patrick, M.D.*

{¶ 79} James Patrick, M.D. is the Lucas County coroner. He performed Nicholson and Archambeau's autopsies. Dr. Patrick went to the crime scene. He entered far enough to see Nicholson, but went no further because he did not want to track through the blood.

{¶ 80} Nicholson sustained two gunshot wounds at close range—one to the chest and one to the right side of the forehead—and sharp force injury. The gunshot wounds caused his death. The neck wound was not fatal. Nicholson had a BAC of .01 and cocaine was ingested within one hour of his death.

24.

{¶ 81} Archambeau sustained a gunshot wound to the right side of his nose, blunt force injury to the head, and sharp force injury to his neck. There was extensive fragmentation of his skull and damage to his brain; a piece of his skull was pushed in. The injury to his brain occurred while he was alive and was the principal cause of his death. The gunshot wound was not lethal, although it caused a lot of bleeding. Dr. Patrick did not know what caused the head injury, but it could have been a brick. The presence of cocaine and alcohol was detected in Archambeau's blood—he had a .07 BAC according to the coroner's report admitted as an exhibit.

### 18. Rosetta Perry

{¶ 82} Rosetta Perry was called by the state. In exchange for her testimony, the state gave Perry $1,000 to help her relocate.

{¶ 83} Perry was at 410 Ohio Street in the hours before York, Archambeau, and Nicholson were murdered. She knew them through her aunt, Pam Smith. She also knows Thompson.

{¶ 84} Perry got to 410 Ohio Street around 8:00 or 9:00 p.m. on October 23, 2006. Her aunt (Smith) was also there. It was Nicholson's birthday. The men were drinking Cobra and Milwaukee's Best. There were no drugs there when she got there, but Archambeau called Fletcher Douglas to purchase some. Despite phone records that showed that Archambeau made or received dozens of calls, Perry said that this was the only call Archambeau made between 8:00 p.m. when Perry got there and the time she

left. Perry's aunt left around 9:30 or 10:00 p.m. The drugs arrived about ten or 15 minutes after Smith left.

{¶ 85} York came over to 410 Ohio Street to talk to Archambeau and Nicholson about stealing cash and drugs from Thompson's apartment. He said he would let them know when they could do it. York left for about an hour and got back around 11:00 p.m. or 12:00 a.m. He announced that Thompson was gone. York, Archambeau, and Nicholson left and went over to Thompson's place. They came back about 30 minutes later with $10,000 and two or three ounces of crack cocaine, all of which York had stuffed in his pants. They laid the money on the table to count it and they smoked the crack. The men were worried what would happen if Thompson found out, but made no effort to hide the drugs or money.

{¶ 86} Perry left between 3:00 and 3:30 a.m. because she felt sick from smoking too much. She said she had consumed an extraordinarily large amount of drugs that night—more than usual. When she left 410 Ohio Street, Nicholson and York were upstairs and Archambeau was downstairs. Outside, Perry saw Thompson and two other black men walking to 410 Ohio Street in a staggered fashion. She heard no conversation and saw no weapons, but she got scared and ran because she knew about the stolen drugs and money. On direct examination, she said that she went to the apartment of Marcus Buddicker near Regina Manor, where she stayed the rest of the night. On cross-examination, she seemed to say that she went to the house she was living at with her aunt on Chase Street.

26.

{¶ 87} Thompson and York were very close friends. But Perry said that when you are on drugs, you do not care who you hurt.

{¶ 88} Perry was asked questions about the interior of the Ohio Street house. She said there was a mattress and box springs in the bedroom, but no TV; the video from the scene shows that there was a TV on in the bedroom and there was a mattress but no box springs. There were lamps and a ceiling light in the bedroom. The lights in the kitchen did not work. There was a door lying on its side and boxes of clothes. There were three chairs in the dining room. Contrary to what was depicted in the crime scene photos, Perry said there was no big cardboard box and no heavy plastic. She said there was a functioning TV sitting on top of a non-functioning TV in the corner of the living room facing the dining room, which was on. Contrarily, the video shows that there was a console TV in the corner of the living room, but there was also a TV in the dining room; it was not on and it was not atop another television. Perry was asked to describe the victims' clothing. She provided a description, but also said that she did not really remember; notably, her description of the clothing did not match what the victims were wearing at the time of their murders.

{¶ 89} Perry heard about the murders the next morning around 8:00 a.m. from Marquis Robinson. About two weeks later, while at Marcus Buddicker's house, she spoke to Anderson and told him this same story, but instead of telling him that she had personally observed the events, she told him it was "hearsay" because she did not want to

27.

be in the position of having to testify. She did not speak with law enforcement again until the Sunday before trial.

### 19. *Detective Lawrence Anderson*

{¶ 90} Larry Anderson is a Toledo Police Detective. He arrived at 410 Ohio Street around 6:00 a.m. He has interviewed between 75 to 100 people in connection with the case. Thompson's name came up after they reviewed cell phone records. There were calls between Thompson and Archambeau in the early morning hours of October 24, 2006.

{¶ 91} Anderson began trying to contact Thompson. He talked with him on November 1, 2006, with Thompson's attorney present, but the interview was mistakenly not recorded. Thompson said he did not know Archambeau. Thompson said he was with Tivita Pierce at the time of the murders and Kenya Sharp picked him up the next morning.

{¶ 92} Anderson spoke with Pierce on April 15, 2007. She did not corroborate this story. He also spoke with Sharp several times. Sharp said she was with Thompson on October 23, 2006, until 10:30 p.m. then heard from him around 6:30 or 7:00 a.m. on October 24, 2006. At first she said she picked him up from Pierce's home, but in the last conversation he had with her, she admitted that she did not.

{¶ 93} Anderson denied that he paid Sharp to testify or that he threatened her with criminal prosecution. Sharp was charged with obstruction and receiving stolen property, however. Those charges were dismissed on the same day as her September 21, 2007

28.

interview with law enforcement. Anderson does not recall threatening to take away Sharp's children, but he conceded that he told her that she could be separated from her children if she was convicted of obstruction. Anderson showed Sharp pictures of Nike Up Tempos shoes and Sharp confirmed that Thompson had that style of shoes. Anderson acknowledged that Sharp was reluctant to speak to him and that her story evolved over time.

{¶ 94} Anderson talked to Goldy. He claimed he was with his girlfriend, Latoya Coley, on the night of the murders. Phone records showed that Goldy called Coley during the time he claimed to be with her. Anderson learned that on the morning of the murders, Goldy had left work and told his employer that he went to the hospital to be with another girlfriend, D.B., who had experienced a cancer scare. The hospital where Goldy claimed to have gone reported that D.B. had not sought treatment there in the preceding year.

{¶ 95} Anderson spoke with the 9-1-1 caller, Kenneth Geno, and Sue Adams, a block watch leader, both of whom said they heard four gunshots and saw a white man and a black man run from the direction of 410 Ohio Street. He also spoke with witness Lynette Avery.

{¶ 96} Anderson interviewed Daniel Ruffing. He was cooperative to some degree but was scared. He talked to Rosetta Perry a couple of weeks to a month after the murders. She told him that the word on the street was that someone stole a large amount

29.

of money and crack from Thompson. Initially, Archambeau's ex-wife, Geno, and Ruffing were all considered suspects.

{¶ 97} There was no genetic link tying Thompson and Goldy to the murders. Efforts were made to ensure that the footprints that were found did not belong to law enforcement. Firefighters were called back so their boots could be checked. Anderson acknowledged that he has no personal knowledge whether Kosmyna, Mohler, and Britt's boots were ever checked.

*20. Kenneth Geno*

{¶ 98} Kenneth Geno was called by the defense. He is the person who called 9-1-1 on the morning of the murders.

{¶ 99} At the time of the murders, Geno had known Archambeau for about a week. He talked to Archambeau on October 24, 2006, several times between midnight and 4:03 a.m. Archambeau was supposed to go to Geno's house that night, but he was drunk so they agreed Geno would go to Archambeau's house. He rode his bike there—it took about 15 minutes.

{¶ 100} As Geno approached the door, he put his foot on the first step, heard someone yell "mother fucker," then heard four gunshots in succession. He got on his bike, rode to the front of the house, and hid in the bushes—the wheel on his bike was still spinning. Within seconds of taking cover in the bushes, he saw a white man leave the house, followed by a black man. The lighting was poor, but he observed that the white man had blondish-brown shoulder-length hair. He said "come on, come on." The black

30.

man followed.  He was wearing a dark hoodie.  The black man had his arms out as if he was holding a gun and he was walking backwards.  The white man was taller than the black man.  The men went into the backyard next to the house through the gate and walked north.  After they were out of sight, Geno got back on his bike and rode home. He then called 9-1-1.

{¶ 101} Police came to Geno's house and he told them the same information to which he testified.  Geno conceded that he did not actually see the men exit the house, but he said that it was doubtful that the men had just been standing there because they were not there when Geno walked up.  He saw the people for about four seconds.  Geno had drank 12 beers that night, but had not consumed any drugs.

*21. Susan Lynne Adams*

{¶ 102} Sue Adams was called by the defense.  She is a block watch leader who lives near 410 Ohio Street with her brother, Larry Anderson, and roommate, Peggy Green.  Her bedroom faces the backyard of 410 Ohio Street.

{¶ 103} At around 4:10 a.m. on October 24, 2006, Adams was awoken by the sound of four gunshots.  Her window was open about four inches.  She grabbed her glasses, got out of bed, and looked out the window.  Adams claimed that a kitchen light was on at 410 Ohio Street, the door was open, there was light coming out the back door, and there was a light on in the alley.  She saw a white male in a light-colored baseball cap run past her window.  She shouted at him, "get the hell out of here."  He looked up at her, but kept running toward the back alley away from Ohio Street.  Thirty-five to 40 seconds

31.

later, she saw a black male in a tan coat with a hoody come out the back door of 410 Ohio Street. Adams yelled for Green to call the police, but she did not know if Green did so. Adams then went to the bathroom. When she returned she saw officers with flashlights. She spoke with Sergeant Tim Noble the next morning around 8:00 a.m. and told him what she observed. She has communicated with Noble over the years in her role as a block watch member.

{¶ 104} Adams saw Archambeau the night before he was murdered. Adams said that Archambeau and his ex-wife did not get along—they argued all the time. She once saw his ex-wife swing a shovel at his head. She had called 9-1-1 in the past due to their fighting.

{¶ 105} In May of 2008, Adams received a letter from the prosecutor requesting a meeting. She told the prosecutor and Anderson the same thing she had told Noble. Adams said that at some point during the interview, she felt intimidated by Anderson and told him that things happened quickly, that she may be wrong, and that she may have confused the October 24, 2006 incident with another incident.

{¶ 106} Adams believes that the black male she saw that night was Goldy. She had seen him at the house before. She saw him urinate in the bushes and took a photograph of him to show Noble. She said that the man she photographed urinating in the bushes was the man she saw run out of the house. When she saw Goldy in person, she confirmed that he was the man she saw. She was adamant that Thompson was not

32.

the man she saw from her window. She had never seen him at the Ohio Street house and did not know he lived in the Columbus Ave. apartment.

## 22. *Peggy Green*

{¶ 107} Peggy Green was called by the defense. She lives with Sue Adams and Adams's brother Larry. On the morning of October 24, 2006, Adams hollered for her to wake up and call the police. She did not do so. About ten minutes later, she saw officers with flashlights. Police cars came and neighbors gathered outside.

{¶ 108} Green learned that there had been a shooting. She and Adams spoke with Detective Noble at 7:30 or 8:00 a.m. Green did not hear any gunshots that night, although she has heard gunshots before. Green did not know Thompson and had never seen him at 410 Ohio Street. She did know Archambeau. He and his ex-wife had often argued and she once saw her hit him with a two-by-four. Green has had to call the police before for fighting, drinking, partying, and drugs at the Ohio Street house.

## 23. *Detective Daniel Navarre*

{¶ 109} Daniel Navarre is a Toledo Police detective. He assisted with the homicide investigation. He was called as a witness for the defense.

{¶ 110} Navarre was at the scene of the murders at 8:00 a.m. on October 24, 2006. By that time he already had pictures of Thompson and Goldy in hand. He went to the apartment on Columbus to talk to Thompson. Sharp was there. She said that she did not know where Thompson was. Navarre gave Sharp his business card to give to Thompson. Thompson never called him.

33.

{¶ 111} There was a blue Chevy Caprice in Thompson's driveway. Thompson was identified as the driver of the Caprice, but it was titled to Goldy. In the Caprice, there was a Budweiser beer cap and a Slim Jim wrapper similar to one found at Ohio Street. There were footprints from the Chevy Caprice to 410 Ohio Street.

{¶ 112} Navarre completed an affidavit for search warrant for Kuch's mother's car—a 1989 Buick Century. In his affidavit, he indicated that Kuch said that on October 24, 2006, at 4:33 a.m., he was in the area of 410 Ohio Street and heard gunshots. Goldy flagged him down and asked for a ride to Erie and Lapier Streets. Goldy had blood on him. Navarre acknowledged that he did not personally obtain this information from Kuch. The information averred in the affidavit came from Anderson.

## B. The Deliberations and Verdict

{¶ 113} After hearing closing arguments and receiving jury instructions, the jury began deliberations.

{¶ 114} In the course of their deliberations, the jurors sent a note to the trial judge asking her to clarify the definition of "aid and abet." The trial judge responded in writing: "I have given you the oral instructions as to the definition of aid and abet. I have also given you a written copy of the instructions. Aid means to help, assist or strength [sic]. Then I have used the word abet. Abet means to encourage, counsel, incite or assist."

{¶ 115} The jury sent another question, asking to view the video of the walk-through of the crime scene. They were permitted to do so.

34.

{¶ 116} In another note, the jury asked "does the act of concealing evidence constitute aiding and abetting? If yes, can that be an elimate [sic] * * * of intent?" The judge interpreted "elimate" to mean "element," nevertheless she responded to the jury that she did not understand the question.

{¶ 117} The jury sent another note to the trial judge: "We have trouble with the factor of aiding abetting [sic]. If the only participation of the defendant was concealing the evidence after the agg*** [sic] murder, does this constitute in and of itself, the intent purpose of the crime?" The judge responded: "[Y]ou have been instructed as to the definitions of intent and purpose as it relates to aggravated murder. Please reference your copy of the jury instructions. If you find beyond a reasonable doubt the only participation of the defendant was concealing the evidence after the aggravated murder, that would not constitute in and of itself aiding and abetting. Such evidence may be considered by you in your deliberations as to any of the elements of the charge of complicity in the comission [sic] of aggravated murder."

{¶ 118} Ultimately, after 15 hours of deliberations, the jury found Thompson guilty of complicity in the commission of aggravated murder of all three men, but not guilty of the firearms specifications.

### C. The Appeal and First Motion for New Trial

{¶ 119} Thompson appealed his conviction on July 3, 2008, and moved for a new trial on August 27, 2008. We remanded the matter to the trial court for disposition of Thompson's motion for new trial. The trial court denied the motion for new trial, and

35.

Thompson appealed that decision. In a decision released on September 30, 2011, we affirmed both Thompson's conviction and the trial court judgment denying his motion for a new trial. *State v. Thompson*, 6th Dist. Lucas No. L-08-1208, 2011-Ohio-5046.

{¶ 120} In challenging both the verdict and the denial of his motion for new trial, Thompson argued that his due process rights were violated under *Brady v. Maryland*, 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194 (1963), because the state failed to produce recordings of Kuch's interviews. Thompson claimed that there were inconsistencies between Kuch's trial testimony and the statements he gave to police concerning the time of his claimed contact with Thompson and Goldy the night of the murders and the direction from which Kuch claimed he saw Thompson and Goldy approach the G unit.

{¶ 121} In his May 16, 2007 recorded statement, Kuch apparently told police that he saw Thompson and Goldy running to the apartment between 12:30 and 1:00 a.m. The police detective said, "the times don't jibe." *Thompson* at ¶ 32. At trial Kuch testified that the event occurred after 4:00 a.m. With respect to direction, Kuch testified at trial that he heard and saw Thompson and Goldy approach the house from the rear, running down the alley from the direction of Ohio Street. In his May 16, 2007 recorded statement, Kuch "provided a variety of versions from they were running down the alley, running from the back of 410 Ohio, running around 410 Ohio, running down the sidewalk on Erie, on Michigan or Ontario, and couldn't really remember." *Id.* at ¶ 33.

{¶ 122} The trial court concluded that Kuch's testimony as to time was clearly different from his trial testimony, but his testimony as to direction did not completely

36.

conflict with the May 16, 2007 recorded statement. But it also found that Kuch's credibility had already been seriously damaged, if not destroyed, on cross-examination at trial. It denied Thompson's motion for a new trial on *Brady* grounds because it concluded that the suppressed evidence was not material because it did not affect the outcome of the trial.

{¶ 123} In our decision, we acknowledged that the state had failed to turn over the DVDs of Kuch's interviews and that it had undisputedly violated Crim.R.16(B)(1)(g) by failing to disclose the existence of the recordings. *Id.* at ¶ 16. But we agreed with the trial court that upon review of the record as a whole, it was not reasonably probable that the outcome of the trial would have been different had the recorded statements been provided to Thompson for use in cross-examination of Kuch at trial.

{¶ 124} For one, we agreed with the trial court that Kuch had been aggressively cross-examined by the defense at trial because his trial testimony was inconsistent with the statement attributed to him in the Danny Navarre search-warrant affidavit (as summarized above). We also noted that Kuch had testified wearing prison garb, restrained by leg chains, handcuffs and belly chain, and testified that he would be released from prison eight months early for testifying against Thompson.

{¶ 125} Additionally, we agreed with the trial court that Kuch's testimony was not the only evidence establishing Thompson's proximity in time and place to the murders. Rather, we concluded, Perry provided independent testimony as to Thompson's proximity in time and place to the murders *and* evidence of motive—i.e., the theft of cash

37.

and drugs that night. We noted that other witnesses, including Pierce, Sharp, Avery, and William Robasser, provided evidence of Thompson's conduct and admissions after the murders. Barnett testified that he observed a .22 or .25 caliber pistol in the door panel of Thompson's truck in August or September 2006. And Ruffing testified that he was "present at [Thompson's] apartment on the night before the murders and saw a semiautomatic pistol in [Thompson's] bedroom." *Id.* at ¶ 44.

{¶ 126} In sum, we found that "[g]iven the strong cross-examination of Kuch at trial, independent testimony from Rosetta Perry as to [Thompson's] proximity in time and place to the murders, evidence of [Thompson's] conduct and admissions after the murders, and evidence of motive due to the theft of cash and drugs that night," it was "not reasonably probable that the outcome of trial would have been different had copies of the May 16 and 23, 2007 recordings been provided to the defense for use in cross-examination of Kuch at trial." *Id.* at ¶ 49.

### D. Federal Habeas Proceedings

{¶ 127} On March 11, 2013, Thompson filed a petition in federal court for a writ of habeas corpus. Attached to his petition was allegedly newly-discovered evidence, including (1) an affidavit from Kenya Sharp, (2) an affidavit from Pam Smith, the aunt of Rosetta Perry, (3) records from the Lucas County Court of Common Pleas pertaining to criminal cases against Smith in 2007, and (4) a Toledo Police internal affairs file in which Detective Anderson, the lead detective on Thompson's case, was found to have committed an "abuse of authority" in an unrelated matter. On January 21, 2014, the

38.

federal court dismissed Thompson's petition without prejudice so that Thompson could pursue his claims in state court. *Thompson v. Shelton*, W.D.Ohio No. 3:13-CV-529, 2014 WL 223378 (Jan. 21, 2014).

### E. Motion for Leave to File a Delayed Motion for New Trial

{¶ 128} On March 28, 2014, Thompson filed a motion for leave to file a delayed motion for a new trial, incorporating the filings from the federal habeas petition. The state moved to dismiss Thompson's motion, arguing, inter alia, that Thompson failed to show that he was unavoidably prevented from discovering the new evidence in a timely manner.

{¶ 129} The trial court agreed with the state and denied Thompson's motion without a hearing. It determined that Thompson "presented no evidence, much less clear and convincing proof, that he was unavoidably prevented from filing a motion for new trial on a timely basis." *State v. Thompson*, 6th Dist. Lucas No. L-15-1006, 2016-Ohio-1399, ¶ 8. It also concluded that Thompson failed to demonstrate that he "exercised reasonable diligence in discovering the grounds to support his motion, or that he could not have learned of the existence of those grounds within the time frame of Crim.R. 33." *Id.*

{¶ 130} Thompson appealed and we affirmed. We agreed with the trial court that Thompson failed to demonstrate by clear and convincing proof that he was unavoidably prevented from discovering the evidence. Despite Thompson's arguments to the

contrary, we held that a motion for a new trial based on *Brady* violations must nevertheless comply with the time restraints of Crim.R. 33(B). *Id.* at ¶ 24.

### F. Second Motion for Leave to File a Delayed Motion for New Trial

{¶ 131} On December 7, 2017, Thompson filed another motion for leave to file a delayed motion for a new trial. This motion was filed after a change in Ohio case law— enunciated in *State ex rel. Caster v. City of Columbus*, 151 Ohio St.3d 425, 2016-Ohio-8394, 89 N.E.3d 598—permitted Thompson to gain access, via a public records request, to investigative work product that had not previously been made available to him ("the *Caster* records"). Before *Caster*, the Ohio Supreme Court had taken the position that investigative work product was not required to be disclosed even after the completion of the trial for which the information was gathered. *See State ex rel. Steckman v. Jackson,* 70 Ohio St.3d 420, 639 N.E.2d 83 (1994), and *State ex rel. WLWT–TV5 v. Leis,* 77 Ohio St.3d 357, 673 N.E.2d 1365 (1997), both of which were overruled by *Caster*. *See Caster* at ¶ 47.

{¶ 132} Visiting Judge Frederick McDonald was appointed to hear Thompson's motion, which the state moved to dismiss. Thompson and the state reached a stipulation as to what materials constituted "new" evidence that was not previously disclosed to the defense. This stipulation was filed with the court February 19, 2020. On the same day, the trial court granted Thompson leave to file a delayed motion for a new trial. It found by clear and convincing evidence that Thompson was unavoidably prevented from discovery of that evidence, and over the state's objection, it found that the delay between

40.

the time the *Caster* records were first produced and the time that Thompson filed his motion for leave to file a delayed motion for a new trial was not unreasonable.

{¶ 133} Thompson filed his motion for new trial on May 18, 2020. He argued that certain exculpatory evidence was kept from him in violation of *Brady,* including (1) a photo of a full-sized shoeprint; (2) the recorded interview of Daniel Ruffing; (3) the recorded interview of Pam Smith; (4) names of alternative suspects and the identities of material witnesses; and (5) letters from John Kuch and James Nicholson.

{¶ 134} *The Shoeprint*. Thompson claimed that the state did not disclose all of the crime scene photos. In particular, it failed to disclose a photo of a full-size Nike Up Tempo shoeprint taken from the piece of visqueen—depicted next to a ruler for added perspective—measuring 13 inches from toe to heel. Thompson argued that this was critical to the defense because a 13-inch foot is an approximate shoe size of 14— Thompson wears a size 8.5, which fits a foot roughly 10.25 inches long. Thompson acknowledged that on direct appeal, he argued that the state's failure to present evidence regarding the size of the shoe rendered his conviction against the manifest weight of the evidence, but, he maintained, he had no knowledge at that time that a photograph measuring the visqueen print existed. He insisted that this evidence was exculpatory and material to his defense given that the state had argued that the Nike shoeprint belonged to him and had elicited testimony from Sharp that she had seen him wear Nike Up Tempos and saw him tear up a Nike shoe box. The state had highlighted this evidence during closing argument.

41.

**{¶ 135}** *The Daniel Ruffing Interview*. Thompson claimed that the recording of the interview of Daniel Ruffing—not produced until he was provided the *Caster* records—was material because in it, Ruffing contradicts several critical facts to which he testified at trial. For one, Ruffing testified at trial that in the hours before the murders, he saw an automatic pistol on top of the entertainment center in Thompson's bedroom. But during his recorded interview, he told law enforcement that he knew for a fact that Thompson did not have a gun on the night of the murders—the gun he saw was a BB gun. On cross-examination at trial, Ruffing allowed for the possibility that the gun he saw could have been a BB gun or airsoft gun, but he said he could not know without picking it up—he testified he did *not* touch or pick up the gun. But at his interview he told law enforcement that he *did* pick up the gun and knew it was a BB gun because he had handled it. Thompson argued that this was a material fact because Ruffing's testimony that he saw a gun just hours before the murders helped convince the jury that Thompson could have been the murderer, and, importantly, Ruffing's testimony was emphasized during the state's closing. Thompson insisted that if he had the recording, he could have impeached Ruffing's testimony. This would have raised questions about how Thompson acquired a gun between the time Ruffing left the apartment and the time the murders occurred.

**{¶ 136}** Additionally, Ruffing testified at trial that Thompson and York discussed a break-in at the Columbus Street apartment during which a television had been stolen. During closing, the state argued that according to Ruffing, Thompson was obsessed with

42.

the burglary just hours before the killings. But when he was interviewed by police detectives, Ruffing told them that there had been no break-in—Sharp had broken the window at the apartment—and Thompson and York were both high and were "cool" with each other, "goofing around back and forth." Thompson argued that this inconsistency is material because it was evidence of Thompson's state of mind the night of the murders. He maintained that if he had that evidence at trial, it could have undermined the state's theory concerning the motive for the murders.

{¶ 137} *The Pam Smith Interview.* Pam Smith did not testify at trial—her niece, Rosetta Perry, did. Thompson argued that Perry's testimony was crucial because she testified that (1) she was at 410 Ohio Street shortly before the murders, (2) the victims stole drugs and money from Thompson's apartment while she was there, and (3) she saw Thompson and two men walking toward the house as she left. Thompson insisted that Pam Smith's recorded interview raised serious credibility issues concerning Perry's testimony for several reasons.

{¶ 138} First, Perry testified that Smith was at 410 Ohio Street earlier in the evening; Smith said she was not. Second, Perry testified that other than her brief initial questioning when she told Detective Anderson what she had *heard* about the murders, she did not speak to law enforcement again until the Sunday before trial. But during Smith's interview, Anderson made reference to an additional undisclosed conversation with Perry. Third, Smith told Anderson during her interview that Perry is a liar.

43.

Thompson argued that this information concerning Perry's reputation for dishonesty would have provided the jury additional evidence with which to assess her credibility.

{¶ 139} Thompson argued that Smith's interview also shed light on other potential alternative suspects that the police knew about but did not pursue. Smith talked about a man nicknamed Crew who she believed was cruel enough to commit the murders, and she said that she learned of the murders when a man nicknamed Heavy knocked on her door to tell her some guys had been killed. Smith also said that she heard that a "white guy" (Roger Barnett) went to Fletcher Douglas's house and told him he needed to clean up after a butchering. Thompson maintained that this detail could have provided fodder for cross-examination.

{¶ 140} *The Alternate Suspects and Additional Witnesses.* Contained in the *Caster* records were mugshots and crimestopper tips identifying the following suspects or witnesses that Thompson argued may have proved helpful to his defense. They included:

(1) Gerry Pass. There was a printout of a mugshot of Carl Pass with a handwritten note stating that Gerry Pass was "at the party on Monday when the guys were murdered" and "neighbors say he was seen running from the house."

(2) L.R. There was a mugshot of R.H. with a handwritten note stating that R.H.'s wife was raped by L.R. and R.H. believed L.R. was involved in the murders.

(3) John Hixson. There was a mugshot of John Hixson with information indicating that he was named a suspect through an anonymous tip. There was a

44.

note stating "talked—11/14/06," but there were no interview notes contained in the file. Nevertheless, Hixson's DNA was tested.

(4) Michael Dotson. Crimestopper tips suggested that Michael Dotson could be connected to the murders. According to those tips, Dotson knew of the murders before they were announced on the news, and Dotson told officers he was with Archambeau and Nicholson until 11:00 p.m. the night before the murders.

(5) Anson Crandall. There was a mugshot of Anson Crandall with a note that said "Wit. Homicide," suggesting he was a witness to the murders. There were also notes indicating that Crandall was interviewed, but no discovery was provided concerning this witness.

{¶ 141} *The letters from Kuch and James Nicholson*. A letter from James Nicholson to the Lucas County Prosecutor was included in the *Caster* records. In it, James claimed to know the details surrounding the murders and indicated his belief that the murders were tied to drug gangs. His trial testimony made no mention of drug ties. Additionally, in his letter, he claimed that when he broke into the G unit, he kicked in the door; at trial he said he went in through a broken window by removing a piece of plywood. Thompson believed that this inconsistency came after Ruffing's interview, which established that the window had been broken earlier by Sharp.

{¶ 142} There was also a letter from John Kuch in the *Caster* records. In it, Kuch demanded a sentence of probation in exchange for his testimony. He wrote, "If you look

45.

out for me, I'll look out for you." Thompson insisted that this "clear quid pro quo demand" was material because it would have helped to impeach Kuch's credibility.

{¶ 143} The state opposed Thompson's motion. It began by explaining that five witnesses—Sharp, Ruffing, Kuch, Dotson (who was never called), and Avery—were properly certified under the former version of Crim.R. 16(B). The identities of these witnesses were disclosed to the defense three days before trial and for those certified witnesses who did not wish to speak to the defense, the state prepared summaries of their expected testimony, which were provided to defense counsel during trial as required under Crim.R. 16(B)(1)(g). The state maintained that witnesses' statements had been provided to the trial court for in camera inspection to determine inconsistencies after the direct examination of each witness. Where there were inconsistencies, the statements were provided to defense counsel for use in cross-examination.

{¶ 144} The state claimed that to be entitled to a new trial based on newly discovered evidence, Thompson was required to show that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. *State v. Hawkins,* 66 Ohio St.3d 339, 350, 612 N.E.2d 1227 (1993), citing *State v. Petro,* 148 Ohio St. 505, 76 N.E.2d 370 (1947). It maintained that this standard applies even

46.

where a *Brady* violation is alleged. It challenged each item of evidence that Thompson claimed entitled him to a new trial.

{¶ 145} *The Shoeprint*. The state claimed that because the heel of the print is not well-defined, Thompson's suggestion that the shoeprint is 13 inches long is at best an argument or opinion. It argued that two photographs of partial prints admitted at trial—when taken together—allowed for an assessment of the length of the shoe. The state also contended that in arguing that a 13-inch shoeprint corresponds to a size-14 shoe, Thompson assumed, without proof, that a shoeprint is identical to the length of the foot it fits. The state countered that, in fact, shoes frequently have reinforced toe boxes with inner, mid, and outer soles, which extend the length of the shoe beyond the length of the foot itself. As such, it claimed, the photograph of the shoeprint is both immaterial and cumulative of other exhibits introduced at trial.

{¶ 146} *The Daniel Ruffing Interview*. The state argued that cross-examination of Ruffing covered the possibility that the gun Ruffing saw was a toy or BB gun, so "little would be gained from exploring the alleged inconsistency between his testimony and his interview." It also claimed that Ruffing's statement contrasted sharply with that of Roger Barnett, who testified that he saw a .22 or .25 caliber handgun in the door panel of Thompson's truck. The state emphasized that defense counsel did not cross-examine Barnett on the potential that the gun Barnett saw was not real, instead focusing on Barnett's uncertainty of the caliber of weapon and the fact that others had access to the

47.

gun. This, the state claimed, strongly suggested that defense counsel was already aware of Ruffing's prior statements.

{¶ 147} In any event, the state insisted, Ruffing's testimony about the nature of the gun in the bedroom was "a minor aspect" of the case "and only one piece of evidence that put a gun into Stoney's hands." Moreover, Ruffing, Barnett, and Kuch all acknowledged having seen Thompson with a gun sometime in the past. The state argued, therefore, that the alleged inconsistencies between Ruffing's interview and trial testimony did not create a "strong probability" of a different result.

{¶ 148} As to Thompson's demeanor the night of the murders, the state argued that there was no inconsistency because even at his interview, Ruffing stated that Thompson was "cool" at first, but then got "pissed" because someone had stolen something from him. Similar to his testimony at trial, at his interview, Ruffing stated that Thompson and York got quiet when Nicholson came over.

{¶ 149} *The Pam Smith Interview.* With respect to the Pam Smith interview, the state claimed that her opinion that Perry is a "liar" was not admissible. And even if it was, it would not have changed the outcome of the trial because neither the state, "nor Perry herself," attempted to portray her as "a faultless citizen." She admitted using cocaine, being convicted of theft offenses, losing custody of her children, and telling police that her story was hearsay instead of admitting that she was personally present. She also admitted to receiving $1,000 to assist her in relocating.

48.

{¶ 150} As to Perry stating that Smith was at 410 Ohio Street, the state maintained that because Perry said Smith left 410 Ohio Street between 9:30 and 10:00 p.m., that portion of her testimony was not critical to the state's case. The state also pointed out that during Anderson's interview of Smith, he mentioned that he had been told that Smith called someone to notify them that the victims had returned to 410 Ohio Street, thus she could be charged with complicity. This, the state claimed, made Smith "eager to distance herself from the group."

{¶ 151} As for Thompson's claim that Anderson referenced another undisclosed interview of Perry, the state argued that that would amount to an impeachment of *Anderson's* statements during the interview. It claimed that Anderson's accuracy in recounting the identity of sources of information "is irrelevant to Perry's testimony." In sum, the state claimed that there had been no "material inconsistencies," thus there was no reasonable probability that the outcome of the trial would have been different.

{¶ 152} *Alternate Suspects.* The state argued that neither Crim.R. 16 nor Ohio's public records law required it to disclose the existence or identity of uncharged suspects; it was required to disclose only "concrete, specific evidence that tends to inculpate another." The state claimed that Smith's opinions about potential suspects were inadmissible, and her claim that she heard that "a white guy" told Fletcher Douglas "he needed to clean up after a butchering" amounted to gossip or hearsay-within-hearsay.

{¶ 153} As for the mugshots and handwritten notes, the state argued that those were mere queries and not "concrete, specific evidence" of the guilt of someone other

49.

than Thompson. It maintained that the crimestopper tips were insufficient to inculpate Dotson and were problematic given that Dotson was a certified witness for the state. Accordingly, the state claimed that the evidence regarding other suspects was immaterial.

{¶ 154} *The Kuch and James Nicholson Letters.* With respect to James Nicholson's letter, the state maintained that his statement that he "kicked in the door" was not inconsistent with his trial testimony indicating that he moved boards to get in and out of the house. As for the Kuch letter, the state argued that Kuch had acknowledged at trial that he was testifying under an agreement that would allow his release from prison, thus there was no inconsistency between the letter and his trial testimony. "In the absence of such an inconsistency," the state claimed, Thompson cannot demonstrate that material evidence was withheld or that there was a "strong probability" of a different result at trial.

{¶ 155} Thompson filed a reply brief in support of his motion. He argued that the state had offered an incorrect standard for evaluating a motion for new trial based on a *Brady* violation. It maintained that the U.S. Supreme Court's decision in *Kyles v. Whitley,* 514 U.S. 419, 433-434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), provides the appropriate standard—not the Ohio Supreme Court's pre-*Brady* decision in *Petro*.

{¶ 156} Thompson also clarified that the *Caster* records at issue in his motion were not provided to the trial court for an in camera review of the witnesses' prior statements. He emphasized that where materials are withheld that would have served as a

50.

basis for impeachment, *Brady* is violated and that evidence can be asserted as a basis for a new trial.

{¶ 157} Finally, Thompson refuted the state's attempts to downplay the significance of the new evidence at issue. He insisted that the partial prints admitted at trial did not show the length of the shoe and the actual measurement of the shoe was critical physical exculpatory evidence. He argued that the Ruffing interview would have informed his cross-examination. And he argued that by concealing the names of the many individuals discussed in his motion for new trial, the defense was deprived of the opportunity to conduct its own investigation. Thompson maintained that discounting the evidence as immaterial on the basis that they did not "exculpate and inculpate anyone" was an incorrect standard.

### G. The Trial Court Judgment Denying Thompson's Motion for New Trial

{¶ 158} While Thompson's motion was in the process of being briefed, Judge McDonald died unexpectedly. A new judge—retired Judge James Bates—was appointed to hear the motion.

{¶ 159} In a judgment journalized on January 6, 2021, the court denied Thompson's motion. With respect to Thompson's arguments concerning the shoeprint, the court found that (1) the shoeprint, while not shown to the jury, was known to defense counsel before trial; (2) the claim concerning the length of the shoeprint was raised in his direct appeal and is an argument or opinion; and (3) the shoeprint is not newly-discovered evidence.

51.

{¶ 160} With respect to the Ruffing interview, the trial court found that Ruffing's testimony about seeing a gun in Thompson's room just hours before the murder did not create a "strong probability" of a different outcome because (1) Ruffing had been extensively cross-examined at trial and testified that the gun he saw was not actually a firearm; (2) the testimony about the presence of a gun in Thompson's bedroom was "a small or minor part of the State's case"; (3) Roger Barnett said he had seen Thompson with a gun; and (4) Kuch testified that he had sold several guns to Thompson. As to Ruffing's testimony about Thompson's demeanor on the night of the murders, the court found that the interview was not inconsistent with the trial testimony and "also may not have been newly discovered evidence."

{¶ 161} Concerning Rosetta Perry's credibility, the trial court concluded that Smith would not have been able to offer testimony opining that her niece was "a liar lacking credibility." Moreover, it held, the state "did not attempt to hide any credibility issues on Perry's part" given that she admitted that she had a drug habit, supported that drug habit by committing thefts, lost custody of her children, and admitted lying to Detective Anderson when she first spoke to him. Finally, the court held, even if Smith had been allowed to express her opinion concerning Perry's credibility, this did not create a reasonable probability of a different outcome.

{¶ 162} And as to alternative suspects that Thompson learned of when he obtained the *Caster* records, the court held that neither R.C. 149.43(A)(2)(a) nor Crim.R. 16 require the disclosure of information regarding the investigation or the identity of

52.

uncharged suspects—*Brady* requires the disclosure of only "concrete, specific evidence" that incriminates another. The court found that the mugshots, crimestopper tips, and correspondence with Kuch and James Nicholson was not *Brady* material.

{¶ 163} In sum, the court held, the evidence raised in Thompson's motion for new trial "[did] not cast doubt on the jury's verdict in this case[,] [s]ome of the information is not newly discovered[,] [s]ome of the information was available at the time of trial, and some of it was available at the time of his prior appeals * * * [or] at the time of his prior Motions for New Trial."

{¶ 164} Thompson appealed. He assigns the following error for our review:

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY

DENYING MR. THOMPSON'S MOTION FOR A NEW TRIAL[.]

## II. Law and Analysis

{¶ 165} Under Crim.R. 33(A)(6), a defendant may move for a new trial "[w]hen new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial." The motion must be filed within 120 days after the jury renders its verdict. Crim.R. 33(B). A defendant who fails to file a motion within the 120-day period must seek leave from the trial court to file a delayed motion. *State v. Montgomery*, 6th Dist. Lucas No. L-15-1282, 2016-Ohio-7527, ¶ 43. To be entitled to leave to file a delayed motion for a new trial the defendant must provide "clear and convincing proof" that he was "unavoidably prevented" from

53.

discovering the evidence on which his motion is based. Crim.R. 33(B); *State v. Sandoval*, 6th Dist. Sandusky Nos. S-13-032 and S-13-034, 2014-Ohio-4972, ¶ 13.

**{¶ 166}** Here, the trial court granted Thompson's motion for leave to file a delayed motion for a new trial. The state did not appeal that decision, therefore, the timeliness of Thompson's motion is not at issue. As such, we turn to the merits of Thompson's motion for new trial and consider whether the trial court committed reversible error in denying that motion.

**{¶ 167}** Generally speaking, to establish that he or she is entitled to a new trial based on the ground of newly discovered evidence, the defendant must show that the new evidence "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *Petro*, 148 Ohio St. 505, 76 N.E.2d 370, syllabus. We would typically review a trial court's decision to grant or deny a motion for new trial based on newly discovered evidence under an abuse-of-discretion standard. *Hawkins*, 66 Ohio St.3d at 350, 612 N.E.2d 1227. Here, however, Thompson's motion is premised on his claim that the state suppressed evidence in violation of *Brady*.

**{¶ 168}** *Brady* imposes on the government "an obligation to turn over evidence that is both favorable to the defendant and material to guilt or punishment." *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 153. It holds that "the

54.

suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. The U.S. Supreme Court has clarified that both impeachment and exculpatory evidence fall within the *Brady* rule. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). It has also explained that favorable evidence is material "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different.'" *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), quoting *Bagley* at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley* at *id.*; *State v. Johnston,* 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph five of the syllabus.

{¶ 169} The U.S. Supreme Court summarized in *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), that there are three components of a "true *Brady* violation": (1) the evidence "must have been suppressed by the State, either willfully or inadvertently;" (2) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" and (3) "prejudice must have ensued"—i.e., the evidence was material. Importantly, "the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions." *Id.* at 290. Moreover, "[t]his standard of materiality does not

55.

require that disclosure of the evidence would have resulted in the defendant's acquittal." *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 39, citing *United States v. Agurs* , 427 U.S. 97, 111, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Rather, the relevant question is whether, in the absence of the evidence, the defendant received a fair trial, "understood as a trial resulting in a verdict worthy of confidence." *Kyles* at 434; *Brown* at ¶ 40. Thus, *Brady* is violated "when the evidence that was not disclosed 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.*, quoting *Kyles* at 435. The "materiality" of suppressed evidence must be considered collectively, not item by item. *Kyles* at 436. Our review of the materiality of evidence is de novo. *State v. Carroll*, 6th Dist. Lucas No. L-05-1362, 2007-Ohio-5313, ¶ 57.

{¶ 170} Where the issue pertinent to a motion for new trial involves the state's suppression of evidence favorable to the defendant, a court of appeals applies a due process analysis rather than an abuse-of-discretion test because the issue on review concerns the right to a fair trial. *Johnston* at 60. "In such a case, the usual standards for new trial are not controlling because the fact that such evidence was available to the prosecution and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial." (Internal quotations omitted.) *Id.*, quoting *United States v. Kelly*, 790 F.2d 130, 135 (C.A.D.C.1986), citing *Agurs* at 111. To be clear, this means that "the defense does not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in

56.

acquittal, the standard generally used to evaluate motions filed under Crim.R. 33." *Id.,*

*citing Agurs* at 111. Again, our review is de novo. *Carroll* at ¶ 69. *See also State v.*

*Mapp*, 3d Dist. Union No. 14-10-34, 2011-Ohio-4468, ¶ 22 ("[W]e review de novo a trial

court's resolution of a new trial motion based upon an alleged *Brady* violation, inquiring

whether the defendant's due process rights were preserved.").

{¶ 171} The parties' positions on appeal are substantially the same as the

arguments they made in the trial court.[1] We address their positions and determine

whether the state's suppression of the evidence warrants a new trial.

{¶ 172} Before doing so, we note that there was no physical evidence tying

Thompson to the crimes. No murder weapons were found. The victims' blood was not

detected in the cars the police searched or in Thompson's home. There were no

eyewitnesses to the murders.

{¶ 173} The most significant evidence against Thompson was (1) Perry and

Kuch's testimony placing him in close proximity to 410 Ohio Street around the same

time the murders occurred; (2) Pierce and Sharp's testimony that Thompson asked them

to tell police he was with Pierce the night of the murders; (3) Perry, Ruffing, and James

Nicholson's testimony that Thompson had a motive to kill the victims—i.e., theft of

$10,000 and crack cocaine (according to Perry), theft of an old-model television

(according to Ruffing), or theft of items that included an air compressor, the old-model

---

[1] Thompson did not raise arguments on appeal concerning the Kuch and Nicholson letters.

57.

television, and various other small-value electronics (according to James); (4) Kuch's testimony that Thompson threw a paper bag into the trunk of a car and Sharp's testimony that Thompson disposed of some heavy garbage bags, wore Nike Up Tempo shoes, and shredded a Nike box; and (5) Avery, Robasser, and Sharp's testimony about statements Thompson made implying possible involvement in the murders.

{¶ 174} On the other hand, the 9-1-1 caller and a neighborhood block watch member both heard four gunshots, then immediately saw a white man and a black man run from the direction of the house. The jury struggled with its verdict, deliberating for 15 hours and asking the court for clarification several times in the process.

{¶ 175} Against this backdrop, we consider whether Thompson has demonstrated a "true *Brady* claim." *See Strickler*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286. It is undisputed that the evidence at issue was suppressed by the state, so that component of Thompson's *Brady* claim has been satisfied. This leaves us to resolve the remaining two components of his *Brady* claim: whether the evidence is favorable to Thompson and whether Thompson suffered prejudice.

{¶ 176} As to whether the evidence is favorable to Thompson, we will evaluate the undisclosed evidence "item by item" to determine if it is either exculpatory or impeaching because, as the U.S. Supreme Court recognized in *Kyles,* "there is no other way." *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way."). Then at the end of our discussion, we will consider the cumulative effect of any favorable

58.

evidence "for purposes of materiality"—i.e., the prejudice component of Thompson's *Brady* claim. *See id.* (evaluating the cumulative effect of the evidence for purposes of materiality separately and at the end of its discussion).

## A.  The Shoeprint

{¶ 177} The state withheld a photo of a full-size bloody shoeprint—left on the piece of visqueen from the floor of 410 Ohio Street—with the characteristics of the Nike Up Tempo shoe that the state claimed Thompson wore when he allegedly committed the murders.  Thompson insists that the shoeprint, which he says is 13 inches long, shows that the killer wore a size 14 shoe—he wears a size 8.5, which he says corresponds to a foot measuring 10.25 inches.

{¶ 178} Despite the trial court's suggestion that the shoeprint was not newly-discovered evidence, the state does not deny that this photo was not provided to the defense before trial.  Rather, it maintains that (1) the evidence is cumulative because Exhibits 58 and 59 can be combined to produce a full-size shoeprint, (2) smudges on the heel of the full-size shoeprint render a measurement of it merely opinion or argument, and (3) the length of the shoeprint does not necessarily correspond with the length of the foot it fits, therefore, the fact that a size 8.5 shoe fits a person with a 10.25-inch foot does not mean that the bottom of a size 8.5 shoe measures less than 13 inches.

{¶ 179} We disagree with the state that the photo of the full-size shoeprint is cumulative.  While the cobbling together of Exhibits 58 and 59 may produce an approximation of the length of the shoe, it is not of the same evidentiary quality as the

full-size shoeprint disclosed as part of the *Caster* records. The photo of the full-length shoeprint allows for a much more accurate measurement and would have been more impactful.

{¶ 180} We agree with the state that the shoeprint is not perfectly pristine because of a smudge on the heel. Arguably, the smudge *may* reduce the length of the shoeprint by about one-half to one inch, so there is some room for debate over the length of the shoeprint. In our view, the shoeprint measures somewhere between 12 and 13 inches. It cannot reasonably be claimed that it is any shorter than that.

{¶ 181} The state's strongest argument is that suppression of the shoeprint does not warrant a new trial because the length of the sole of a shoe "does not necessarily correspond to the length of the foot it is intended to enclose and protect." Although stated in different terms, the essence of the state's argument is that Thompson has failed to demonstrate that the suppressed shoeprint was favorable to his case, either as exculpatory or impeaching evidence. We agree with the state.

{¶ 182} To show that the shoeprint was favorable to his defense, it was not enough for Thompson to say simply that a size 8.5 shoe fits a 10.25-inch foot. Rather, Thompson needed to produce evidence of the length of the bottom of a size 8.5 Nike Up Tempo shoe. If the bottom of a size 8.5 Nike Up Tempo shoe measures less than the length of the shoeprint depicted in the photo, the photo would be favorable to his defense because it would tend to show that the bloody shoeprint was left by someone who wears a shoe larger than what Thompson wears. But here, because we do not know whether the

60.

bottom of a size 8.5 Nike Up Tempo shoe measures less than the shoeprint depicted in the photo, we cannot say that the photo was favorable to Thompson.

{¶ 183} Accordingly, while the photo of the full-size shoeprint should have been disclosed to the defense before trial, Thompson has failed to show that the state's suppression of the shoeprint entitled him to a new trial because he has not demonstrated that the shoeprint was exculpatory or impeaching evidence.

### B. Daniel Ruffing

{¶ 184} The state withheld evidence of the recorded interview of Daniel Ruffing. Thompson argues that statements Ruffing made in his recorded interview contradicted his trial testimony. He claims that this evidence would have undermined Ruffing's credibility and established exculpatory facts regarding Thompson's alleged motive for the murders, his demeanor in the hours before the murders, and his ability to carry out those murders. The state downplays the inconsistencies between Ruffing's trial testimony and his recorded interview and the importance of Ruffing's testimony to its case.

{¶ 185} As to motive, Ruffing testified at trial that late in the evening of October 23, 2006, Thompson and York were talking about a break-in at the G unit and indicated that someone down the street had something to do with it. The inference the state wanted the jury to make was that Thompson killed the victims to avenge the break-in. At his interview, Ruffing said that someone at "that house" (410 Ohio Street) owed Thompson money and York said he'd go down there and get it. Ruffing acknowledged that a TV may have been stolen from Thompson's apartment, but he could not think of anything

else that may have been missing. Ruffing was adamant, however, that there had been no "break-in" at the G unit—he said that Sharp broke the front window at the apartment because she was jealous that Thompson was inside with another woman. Although there are some discrepancies between Ruffing's trial testimony and his recorded statements pertinent to Thompson's alleged motive, those discrepancies are relatively insignificant.

{¶ 186} As to Thompson's demeanor, Ruffing testified at trial that the night before the murders, Thompson was becoming angry and more agitated the more he talked about what had been stolen from him. After about ten minutes, he did not want to talk about it anymore, and when Nicholson stopped over, the conversation stopped completely. At his interview, Ruffing stated that Thompson and York were "cool" and "goofing around," but he also stated that Thompson was "pissed" that something had been stolen from him. He said the conversation between Thompson and York was serious, and Thompson and York stopped talking when Nicholson came in. We see no significant discrepancy between Ruffing's trial testimony and his statements concerning Thompson's demeanor.

{¶ 187} As to Thompson's ability to carry out the murders—i.e., his possession of a gun—Ruffing testified at trial that he saw a black gun in Thompson's bedroom, just hours before the murders. On cross-examination, he allowed for the possibility that the gun could have been a "toy," but he also said that he could not know for sure without touching it. He testified unambiguously that he did *not* touch the gun, and he questioned why Thompson would have a fake gun.

62.

{¶ 188} But at his interview, Ruffing told Detective Anderson, "at the point when I left that night, [Thompson] didn't have a gun." He told Anderson that Thompson had a black and silver "fake ass BB gun laying on the dresser." He said that it looked real and Thompson tried to act like it was real, but it was fake. Ruffing said that he knew it was fake because he picked it up. He wondered how Thompson could have gotten a gun between the time Ruffing left the G unit, just before 1:00 a.m., and the time of the murders at 410 Ohio Street, around 4:15 a.m.

{¶ 189} Without question, Ruffing contradicted his recorded statement when he testified at trial that he saw a gun at Thompson's apartment. The suppressed evidence was favorable to Thompson because it could have been used to impeach Ruffing's trial testimony on an issue important to the state's case—Thompson's possession of a gun just hours before the victims were murdered.

### C. Pam Smith

{¶ 190} The state withheld the recorded interview of Pamela Smith. Smith did not testify at trial, but her niece, Rosetta Perry, did. Perry testified that (1) she was at 410 Ohio Street shortly before the murders, (2) the victims stole drugs and money from Thompson's apartment while she was there, and (3) she saw Thompson and two men walking toward the house as she left. Perry testified that Smith had been at 410 Ohio Street until 9:30 or 10:00 p.m. on October 23, 2006.

{¶ 191} In her recorded statement, Smith told Detective Anderson that her niece is a liar and, specifically, Perry lied to him when she said that Smith had been present at

63.

410 Ohio Street the night before the murders.  She also identified various people that she believed had knowledge about—or could have committed—the murders.  During the interview, Anderson implied that Perry had provided an additional statement that had not been disclosed to the defense.

{¶ 192} The state argues that suppression of Smith's testimony does not warrant a new trial because her opinions of Perry's credibility were inadmissible.  The state also argues that Smith's opinions about Perry's credibility would not have changed the outcome of the case given that Perry was not presented to the jury as a "faultless citizen."  It insists that Smith's denial of being present at 410 Ohio Street did not significantly undermine Perry's testimony because Perry testified that Smith left between 9:30 and 10:00.  It suggests that Smith may have lied to Detective Anderson during her recorded interview because he mentioned that she could be charged with complicity because he received information that she had made a phone call to alert someone (presumably, the killers) that Archambeau, York, and Nicholson had returned to 410 Ohio Street.  As far as Thompson's claim that Anderson referenced an additional interview with Perry that was not disclosed to the defense, the state claims that this amounted to impeachment of *Anderson's* statements.  It maintains that the accuracy of Anderson's statements is irrelevant to Perry's testimony.

{¶ 193} First, we disagree that Smith would not have been able to offer testimony opining that her niece was "a liar lacking credibility."  While it is true that Smith could not have used those words to describe her niece, under Evid.R. 608(A)(1), "[t]he

64.

credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." In other words, "Evid.R. 608(A)(1) permits a party to attack the credibility of a witness via opinion testimony if it refers to his or her character for untruthfulness." *State v. Habeeb-Ullah*, 11th Dist. Portage No. 2019-P-0006, 2019-Ohio-4517, ¶ 14. *See also State v. Cobb*, 3d Dist. Allen No. 1-20-43, 2021-Ohio-3877, ¶ 67 (same); *State v. Tutolo*, 8th Dist. Cuyahoga No. 60071, 1992 WL 47234, *3 (Mar. 12, 1992) ("Appellant had a right under Evid.R. 608(A)(1) to attack the declarant's credibility by evidence in the form of opinion so long as it referred to [his or her] character for truthfulness or untruthfulness."). Here, assuming that the defense laid a proper foundation—which we assume it could have done given the close relationship between Smith and Perry—Smith could have testified to her niece's character for untruthfulness. *See State v. Durkin*, 11th Dist. Lake No. 11-149, 1986 WL 14949, *1–2 (Dec. 31, 1986) ("Impeachment under Rule [608] is limited to the character trait of untruthfulness," however, "[a] foundation must be laid showing that the character witness is acquainted with the reputation of the principle witness before the character witness is permitted to state his opinion of that reputation.").

{¶ 194} Second, the state understates the impact of Smith's potential testimony. Perry said that Smith was at 410 Ohio Street the night before the murders. Smith said not

only that Perry lies generally, but that Perry specifically lied about Smith being present that night. If Perry was not truthful about who was present at 410 Ohio Street, or, if Perry fabricated that *she* was there that night, this could reasonably call into question the entirety of Perry's account of what happened that night—including, that the victims stole drugs and money from Thompson and that she saw Thompson and two other men walking toward 410 Ohio Street at 3:30 a.m. Had Smith's recorded interview been disclosed to Thompson, Smith could have been called as a witness and her testimony could have been used to impeach Perry's version of events.

{¶ 195} Accordingly, we conclude that Smith's statements in her recorded interview—most importantly, her statements concerning Perry's untruthfulness and that Perry fabricated the fact that Smith had been at 410 Ohio Street on the evening of October 23, 2006—had significant impeachment value and were, therefore, favorable to Thompson's defense.

### D. Additional Suspects/Witnesses

{¶ 196} The state withheld portions of its file identifying other persons of interest in the murders, mainly in the form of crimestopper tips or notes jotted down on mugshots. Additionally, Smith in her interview identified several people that she believed were capable of the crime, she had heard were involved in the crime, or she believed may know something about the crime. The state argues that the information it had did not constitute concrete, specific evidence inculpating someone else, therefore, its

66.

failure to disclose information about these individuals did not constitute a *Brady* violation.

{¶ 197} "Prosecutors are not necessarily required to disclose every stray lead and anonymous tip, but they must disclose the existence of 'legitimate suspect[s].'" *Gumm v. Mitchell*, 775 F.3d 345, 364 (6th Cir.2008), quoting *D'Ambrosio v. Bagley,* 527 F.3d 489, 498-99 (6th Cir.2008); *see also People v. Lumpkins*, 533 N.Y.S.2d 792, 795 (N.Y.Sup.Ct.1988) (noting that "requirement of due process underlying the *Brady* rule includes disclosure of exculpatory leads). Clearly, evidence that someone other than the defendant committed the murders would be exculpatory and, therefore, favorable to the defense.

{¶ 198} For the most part, we agree with the state that there was not concrete, specific evidence inculpating most of the people whose names were contained in the *Caster* records or mentioned by Smith in her interview. But two individuals stand out to us as alternative suspects whose identities should have been disclosed to the defense for potential exculpatory or impeachment purposes: Michael Dotson and Carl or Gerry Pass.

{¶ 199} Twelve crimestopper tips are contained in the *Caster* records. Six of those tips identify Michael Dotson as a potential suspect. Those tips stated as follows:

NO. B01241

Caller states that suspect told him about the 3 murders before it was even on the news. [C]aller talked to det. [A]nderson.

NO. B01278

Anonymous informant states suspect will be at work tonight at Delta Steel in Delta, OH at 7:00/p tonight to work 2nd and 3rd shifts. Suspect knew police were looking for him and Todd Archambeau gave suspect Dotson his keys to stay at his place while they removed suspects [sic] property from suspects house. Suspect Dotson also suppose [sic] to be involved in homicide on Earl St.

NO. B01279

Informant states listed suspect's best friend is Mike Best who lives at 4480 Candle-Branch Rd. in Georgetown, IN. Supposedly Best is seeing Dotson's sister Michelle who lives in Luna Pier. Best and Dotson take turns going from Indiana to Ohio. Best comes up here and stays w/Michelle Dotson in Luna Pier and party w/Dotson or they go to Indiana.

NO. B01281

Caller says susp above talked w/caller son the day of the interview w/channel 11 and that he lived in Port Clinton[.] Caller believes you should check out Port Clinton Ohio[.] Caller also says that on Channel 11 it was stated that the susp called twice[.] Maybe you should check out the cell number of these calls[.]"

NO. B01285

Caller states the suspect was at his sister's: 4354 H Street, Luna Pier, MI as of a week ago. He should be driving a blue Chevy Truck. * * * He doesn't want to be known.

NO. B01286

He was living with his girlfriend in Luna Pier, MI. Caller states Michael had called him back in June * * *. Caller will call back with a cell number for Michael.

{¶ 200} Additionally, notes from interviews contained in the *Caster* records indicate that Dotson was at 410 Ohio Street on October 23, 2006, until 10:00 p.m.—soon before the murders occurred. According to those notes, Dotson himself admitted being there and said that his DNA would be on several beer bottles. Possibly at odds with Perry's testimony about when York had been at 410 Ohio Street, Dotson stated that York was not there when he was there. Significantly, Ruffing in his undisclosed recorded interview told Anderson that he heard Dotson was the last person to see Nicholson or Archambeau, and the unredacted police interview notes indicate that Archambeau's co-worker, Berry Cox, said that Dotson was at 410 Ohio Street at 10:00 p.m.

{¶ 201} Here, the crimestopper tips themselves do not contain any information particularly inculpatory of Dotson. More significant is the *volume* of tips identifying Dotson. This *plus* Dotson's admission to police that he was at 410 Ohio Street within hours of the murders makes the lack of disclosure more troubling. Not only may he have had information pertinent to the murders, Dotson's admission to being in the house that

69.

night has important impeachment value given that Smith was the only other person Perry identified as being there, besides her and the victims. Dotson's statement that York was not there also contrasts with Perry's claim that aside from a short scouting trip at the G unit, York was at 410 Ohio Street most of the night, planning to steal Thompson's money and drugs.

{¶ 202} The state certified Dotson under Crim.R. 16(B)(1), meaning his identity remained confidential until three days before trial, but then never called him to testify. This deprived Thompson of any information relating to Dotson's possible knowledge or involvement. Under the circumstances, we conclude that information pertaining to Dotson was important insofar as (1) his admitted presence at 410 Ohio Street hours before the victims' murders could have provided additional information pertinent to the murders and served as impeachment evidence as against Perry, and (2) the crimestopper tips pointed to someone other than Thompson as the perpetrator of the crime.

{¶ 203} Accordingly, we find that this information about Dotson was favorable to Thompson because it could have served as both exculpatory and impeachment evidence.

{¶ 204} As to Carl or Gerry Pass, a mugshot of Carl Pass is contained in the *Caster* records. A handwritten note on the mugshot says:

Gerry Pass. 2233 N. Erie

also called Dougie—known in neighborhood as drug user. Was at the party on Monday when guys were murdered. Neighbors say he was seen running from the house.

70.

Was home?

{¶ 205} It is unclear whether the note meant that *Gerry* had been at the party and was seen running from the house or whether it meant that *Carl* had been present and was seen running from the house. (Notably, in his mugshot, Carl's hair is shoulder length—like the white man Geno saw running from 410 Ohio Street at 4:15 a.m.) Again, if Pass was present at 410 Ohio Street, partying with the victims, this information would be at odds with Perry's account of the evening. It also may have provided another angle for the defense to explore if Pass was with the victims shortly before their murders and was seen running away from the house. Accordingly, we find that this information about Pass was favorable to Thompson because it could have served as both exculpatory and impeachment evidence.

### E. The Cumulative Effect of the Suppressed Evidence

{¶ 206} To briefly summarize, we have concluded that the Ruffing and Smith interviews and information concerning Dotson and Pass all constitute evidence favorable to Thompson's defense. We must determine, therefore, whether the cumulative effect of the nondisclosure of this favorable evidence resulted in prejudice requiring a new trial. *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555, 131 L.Ed.2d 490. In other words, we must determine whether the evidence is material. In accordance with the guidance of the U.S. Supreme Court, Ohio courts apply the principal that while "each bit of omitted evidence standing alone may not be sufficiently material to justify a new trial, the net effect * * *

may warrant a new trial." *State v. Larkins,* 8th Dist. Cuyahoga No. 82325, 2003-Ohio-5928, ¶ 33, citing *Kyles* at 434.

{¶ 207} We note that the state repeatedly states in its brief that the suppressed evidence does not create a "strong probability" of a different result if a new trial is granted. This is not the correct standard. Thompson need not show a "strong probability" of a different result—he need only show a *reasonable* probability. This is because the evidence that was suppressed was exculpatory or impeachment evidence that should have been disclosed under *Brady*. We, therefore, consider whether there was a reasonable probability of a different outcome had the evidence here been disclosed to the defense and whether the net effect of its suppression places the whole case in such a different light as to undermine confidence in the verdict.

{¶ 208} With respect to Ruffing's recorded interview, the state downplays the importance of his contradictions on the basis that (1) Ruffing did not know whether Thompson kept a gun in his truck, (2) Ruffing had seen Thompson with a gun in the past, (3) Ruffing admitted it was possible that the gun he saw was not real, (4) Thompson's cross-examination of Ruffing suggests that he knew of Ruffing's prior inconsistent statements "potentially as a result of a certified witness packet provided to defense counsel," (5) Ruffing's testimony about the gun was a "minor aspect of the case," and (6) Barnett testified that he saw a gun in Thompson's truck and Kuch said he sold Thompson several guns in the past.

72.

{¶ 209} As we explained above, Ruffing's statements at trial directly contradicted what he told the detective during his interview. No certified witness packets are part of the record, so we will not assume that Thompson was informed of Ruffing's inconsistent statements before his cross-examination[2].

{¶ 210} Moreover, we disagree that Ruffing's testimony was a minor aspect of the state's case or that it was cumulative of the testimony of other witnesses who had seen Thompson with a gun in the past. Ruffing was the only trial witness who placed a gun in Thompson's possession on the night of the murders. Kuch testified that he sold Thompson a .32 (a different caliber weapon) *a month before* the murders; he said he sold him a .25 in the past, but nowhere near the date of the murders. Barnett testified that he saw *either* a .22 *or* a .25 caliber gun in Thompson's truck *one to two months before* the October 24, 2006 murders. Neither Barnett nor Kuch placed a gun in Thompson's hand the night of the murders; only Ruffing did.

---

[2] While no certified witness packets are contained in the record, this court, on July 7, 2022, received from the clerk recently-unsealed transcripts from witness certification hearings that occurred on February 22, 2008, and March 14, 2008. The transcript of the February 22, 2008 hearing reveals that the trial court reminded the state of its obligation "to turn over information that could be Brady information from any of these witnesses, in other words, any witnesses or any information that could be exculpatory * * *." The court emphasized that notwithstanding its decision to seal the identities of the witnesses, "obviously the obligation of the State under the rules of discovery would require that the disclosure of exculpatory statements since these witnesses' identity are being protected, there's a concern by the court, as all courts would have the same concern, that Mr. Thompson, Goldy Thompson, Mr. Stoney Thompson, still be tried in a fair trial situation with all information being provided to them." It reiterated, "the court does remind the State that they do have an obligation to continue to comply turning over exculpatory evidence if there is any."

73.

{¶ 211} Although not raised by the state, we note that Thompson was acquitted of the firearms specification here. This means that the jury was not persuaded beyond a reasonable doubt that Thompson displayed, brandished, or used a firearm to facilitate the murders. This was a strange result for the jury to reach given that (1) the victims were all shot, and Nicholson died of a gunshot wound, and (2) Thompson, having been convicted of complicity, was subject to a sentencing enhancement on a firearms specification regardless of whether he was the principal offender or an unarmed accomplice. *State v. Miller*, 8th Dist. Cuyahoga No. 109214, 2020-Ohio-5431, ¶ 19, citing *State v. Chapman*, 21 Ohio St.3d 41, 42-43, 487 N.E.2d 566 (1986).

{¶ 212} Nevertheless, for several reasons, we find the contradiction between Ruffing's trial testimony and recorded interview important. First, despite the fact that the jury found that Thompson did not display, brandish, or use a firearm to facilitate the murders, Ruffing's testimony about seeing a gun at Thompson's house was impactful— presumably the state intended it to be given that it highlighted this evidence in its closing argument:

> Stoney had an automatic weapon on his dresser the night of the killings, in his bedroom. Now, we spent some time on this during the trial. If you want to believe that Stoney who did business out of the G unit, dangerous and risky business, kept a toy gun on his dresser, so be it. But why wouldn't he let Danny play with his toys then?

{¶ 213} Second, this court thought Ruffing's testimony was important too; it was one of the reasons that we affirmed the trial court's denial of Thompson's first motion for new trial—where Kuch's recorded interviews had been mistakenly withheld from the defense. We observed: "Daniel Ruffing testified that he was present at [Thompson's] apartment on the night before the murders and saw a semiautomatic pistol in [Thompson's] bedroom." *Thompson,* 6th Dist. Lucas No. L-08-1208, 2011-Ohio-5046, ¶ 44.

{¶ 214} Finally, if impeached with his prior statements, the jury may have disregarded Ruffing's testimony in its entirety.

{¶ 215} With respect to Smith's recorded interview, Smith's testimony could have impeached Perry—one of only two witnesses who put Thompson in the vicinity of the murders at the approximate time that the murders occurred. As explained above and further referenced below, Kuch was the other witness who placed Thompson in the vicinity of the murders, and the state failed to turn over recorded interviews where Kuch recalled seeing Thompson near 410 Ohio Street between 12:30 and 1:00 a.m.—not 4:00 a.m. as he testified at trial (the subject of Thompson's first motion for new trial).

{¶ 216} This court recognized the importance of Perry's testimony when we affirmed the trial court's denial of Thompson's first motion for new trial. *See Id.* at ¶ 49. Given the lack of any direct physical evidence tying Thompson to the murders, it was important to the state that the jury believe Perry's version of events**.** If the jury granted credence to Smith's opinion that her niece is not to be believed, it may have rejected

75.

Perry's version of events, including her testimony that Thompson was in the vicinity of 410 Ohio Street at 3:30 a.m.

{¶ 217} Additionally, Perry provided a compelling motive for the murders. Ruffing testified that the victims *may have* owed Thompson money and that an old-model television may have been missing from the G unit; James testified that he stole an air compressor, the old model television, and some other low-value electronics from the G unit. But Perry testified that the victims stole $10,000 and a large quantity of crack cocaine from the G unit. Testimony calling into question the veracity of Perry's testimony could have upended the state's case by eliminating Thompson's supposed motive for committing the murders.

{¶ 218} Finally, with respect to the failure to disclose evidence of alternative suspects, whether suppression of evidence of alternative suspects warrants a new trial depends on the facts and circumstances of the case. In *State v. Carroll*, 1st Dist. Hamilton No. C-020777, 2003-Ohio-5260, ¶ 21, for instance, the court held that "[t]hough it may have been prudent" for the prosecution to have disclosed a crimestopper tip implicating another person in the felonious assault of the victim, the tip was not material under the facts and circumstances of the case because the victim had been attacked by a group of four people, he had specifically identified the defendant as one of those four people, therefore, evidence that someone else may also have been involved in the assault did not cast the case in a different light sufficient to undermine confidence in the outcome of the defendant's trial. On the other hand, in *Castleberry v. Brigano*, 349

76.

F.3d 286, 294 (6th Cir. 2003.), the court found that there was a "reasonable probability of a different outcome of the trial" if the state had disclosed exculpatory and impeachment evidence, which included statements of three of the victim's neighbors who provided information concerning other potential suspects. *See also Brown,* 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, at ¶ 44-46 (finding that evidence in non-disclosed police reports was material where one witness reported that another man had admitted to him that he killed the victims and a police informant stated that yet another person said that he heard that two other men were bragging that they had killed the victims).

{¶ 219} Here, the information suppressed by the state concerning Dotson and Pass undermines Perry's version of events. The only people she identified as being present at 410 Ohio Street were her, Smith, and the victims. The suppressed evidence contains an admission from Dotson that he was there, at least until 10:00 p.m., and suggests that Pass was there at the time the murders are believed to have occurred. And six crimestopper tips identified Dotson as a suspect—important leads that may have altered the defense strategy.

{¶ 220} We conclude that when considered cumulatively, there is a reasonable probability of a different outcome had Ruffing's recorded interview, Smith's recorded statement, and information concerning Dotson and Pass been disclosed to the defense. If the state had failed to disclose only one of these pieces of evidence, our conclusion may be different. But taken together—especially given that there was no physical evidence

and no witnesses to the murders—we find that the suppression of this evidence resulted in a verdict less worthy of confidence.

### F. Kuch—A Comment

{¶ 221} The record—and our decision in *Thompson*, 6th Dist. Lucas No. L-08-1208, 2011-Ohio-5046—reflects that the state inadvertently failed to produce to the defense two videotaped interviews of John Kuch. According to our decision, in those interviews, Kuch stated that he had seen Thompson and Goldy running toward the G unit *not* at 4:00 or 4:15 a.m., as he testified at trial, *but rather* between 12:30 and 1:00 a.m. The police detective apparently told Kuch that "the times don't jibe." *Thompson* at ¶ 32. At his interviews, Kuch also gave differing descriptions of the direction from which Thompson and Goldy were running. The failure to turn over these recorded interviews was the subject of Thompson's first motion for new trial, which the trial court denied and we affirmed.

{¶ 222} We found that the suppressed evidence was not material under *Brady* because it was not reasonably probable that the outcome of trial would have been different had Kuch's recorded interviews been disclosed to the defense. In reaching this conclusion, we emphasized, inter alia, that Perry had also testified that Thompson was in the vicinity of 410 Ohio Street just before the murders took place and that Ruffing had testified that "he was present at [Thompson's] apartment on the night before the murders and saw a semiautomatic pistol in [Thompson's] bedroom." *Id.* at ¶ 44.

78.

{¶ 223} We now know that in addition to Kuch's recorded interviews, Ruffing and Smith's recorded interviews were suppressed. We have concluded that the suppression of those recorded interviews places the whole case in such a different light as to undermine confidence in the verdict. Given the impact this suppressed evidence may have on Perry and Ruffing's credibility, our rationale for affirming the denial of Thompson's first motion for new trial has also been undermined.

{¶ 224} While the suppression of Kuch's recorded interviews is not a basis for our decision today, we raise the issue because it further highlights our concern about the multiple *Brady* violations that occurred in this case.

{¶ 225} We find Thompson's assignment of error well-taken.

### III. Conclusion

{¶ 226} We find that the trial court erred when it denied Thompson's motion for a new trial. Although Thompson failed to show that a new trial was warranted based on the nondisclosure of the full-size bloody shoeprint, we find that, cumulatively, suppression of the recorded interviews of Ruffing and Smith and the failure to disclose information about Dotson and Pass placed the whole case in such a different light as to undermine confidence in the verdict. There was a reasonable probability of a different outcome had this evidence been disclosed to the defense.

79.

**{¶ 227}** We reverse the January 6, 2021 judgment of the Lucas County Court of Common Pleas and remand this matter for a new trial. The state is ordered to pay the costs of this appeal under App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.          _____

                                                                   JUDGE

Christine E. Mayle, J.

_____

Myron C. Duhart, P.J.                                      JUDGE
CONCUR.

_____

                                                                   JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.